STATE, Respondent, *v.* NEELY, Appellant.

(No. 6,860.)

(Submitted June 4, 1931. Decided June 22, 1931.)

[300 Pac. 561.]

200

*Messrs. Duncan & Duncan,* for Appellant, submitted a brief; *Mr. M. M. Duncan* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, *Mr. T. H. MacDonald, Mr. Frank E. Blair,* County Attorney of Madison County, and *Mr. George R. Allen,* for the State, submitted a brief; *Mr. Blair* and *Mr. Allen* argued the cause orally.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Thomas Vern Neely was on August 27, 1930, informed against by the county attorney of Madison county, jointly with Otis L. Vaughn and Arthur W. Pings, for the larceny of a steer belonging to Harry Shaw and alleged to have been stolen on August 25, 1930. Neely and Vaughn were tried jointly; Vaughn was acquitted; Neely convicted, and his punishment fixed at imprisonment for eight years and a fine of $200; he has appealed from the judgment of conviction and from an order denying him a new trial.

The principal contention made by counsel for defendant is, that, conceding the truth of all the proof on behalf of the state, this defendant committed no crime as the principal in the taking of the steer, and he who committed each overt act which would otherwise constitute a crime was one Ralph Harrington, a special stock detective in the employ, and acting under the authority and with the consent of, the owner, Harry Shaw, in all that he did.

The case is one of first impression in this state. In years gone by this court has had before it cases dealing with practically every phase of the cattle stealing game except that of actually urging and inducing a man to steal cattle in order to apprehend him for so doing. Perhaps the reason for this departure from precedent is that on our ranges heretofore the difficulty has been not so much in apprehending cattle thieves as in convicting them.

The evidence, considered in the light most favorable to the state, is substantially as follows: Harry Shaw is a cattleman of the old school and president of an informal stock association running cattle in the southern part of Madison county. The defendant Neely has resided in that vicinity for the past eighteen years, most of which time has been spent on a so-called "Dude Ranch" which he owns and operates on the shores of Cliff Lake, furnishing accommodations and renting saddle-horses and boats to pleasure seekers. Neely leased the place for the years 1929 and 1930 to his son-in-law, Vaughn, and spent the winter of 1929–1930 in Butte, where he worked in the mines and became well acquainted with a fellow worker, Pings; he returned to the ranch in the summer of 1930, and, by tacit agreement, assumed the practical management of the place. Stockmen in the vicinity had for years suffered such losses that they feared they would be forced out of the business. They suspected Neely and Vaughn of stealing their cattle.

Early in August, 1930, Harrington, who had been a special deputy sheriff during a strike in Butte, suggested to Shaw that he might "get in" with the thieves and capture them,

Shaw employed him on behalf of the stock association, agreeing to pay him $400 for each thief caught, and, to aid him in the enterprise, secured his appointment as a stock detective. Harrington then sought out Pings, who had also acted as deputy sheriff during the strike, and urged him to join in trapping Neely and Vaughn, but, owing to his friendship for Neely, Pings refused. A week later Harrington convinced Pings that he had abandoned activities on the side of the law and was in fact a cattle thief, whereupon Pings agreed to go with Harrington to Cliff Lake for the unlawful purpose. On arriving at the Neely place, Pings told Neely of both propositions made by Harrington and urged Neely to go in with them, but without apparent success.

Harrington and Pings returned to Butte, but later went again to Cliff Lake, where Harrington had several talks with Neely on the subject of stealing cattle, and a like conversation with one Roy Edwards. Thereafter Harrington employed Mike Plante, of Butte, to go with him to Cliff Lake as a "state's witness" to hear and see all that he could and later appear against Neely and Vaughn.

On August 23 Harrington, Vaughn, Pings, and Plante rode to the Meridian basin looking for cattle, but found none. Neely refused to go, on the plea that he had to make a trip to Butte, and requested Vaughn to go, as Harrington insisted that he and his companions did not know the way. In an effort to convince the others of his bona fides as a rustler, Harrington told many tales of cattle stealing, and, in return, Neely boasted, as related by Plante, that he had been stealing cattle for fifteen years, and "they" had never been able to get anything on him.

On August 24, Harrington, Pings, and Neely rode to the Meridian basin, and from the rim observed cattle in the basin. Neely remained at the rim; Harrington and Pings rode into the basin, and, after an hour or so of hard riding, succeeded in driving approximately twenty head of cattle out; as they passed Neely he fell in behind the cattle. It would seem that the cattle were "planted" in the basin, as cattle did not usually

range there, and Roy Frye, a herder for the stock association, watched the proceedings from cover and with field-glasses. The cattle were driven to the west arm of Cliff Lake, where they and the three men spent the night. In the morning the men returned to the Neely place, and waited until afternoon, when they crossed the lake in two motor-boats belonging to Neely, taking with them certain implements brought to the lake by Harrington for use in butchering, a knife, and two rifles belonging to Neely. Arriving at the place where they had left the cattle, they discovered that the animals had disappeared. Neely took the boats across the arm of the lake, according to Plante's statement, "to watch to see if there was anybody coming down on us." Plante and Harrington followed the trail, found the cattle, and drove them back to the lake, where, after considerable poor shooting, Pings killed one steer, which was then dressed by Harrington and Pings. Neely then brought the boats back; Pings and Plante loaded the meat in the one handled by Harrington and Pings; Harrington put the hide into the boat, and Neely took care of the tools. Harrington and Plante then piloted the boat containing the meat; Neely and Pings rode in the other. They arrived at the Neely boat landing at approximately 10 P. M. Plante drove the Harrington car to a point near the landing, and turned the headlights directly on the landing, where the four men transferred the meat and hide from the boat to the car.

Being advised in advance as to what was to take place that evening, the sheriff and county attorney of Madison county, Frye, the herder, D. V. Erwin, a stock detective, and a fifth man, watched the proceedings from ambush, and, as soon as the men had entered the Neely house, followed and arrested them. Neely, being questioned, denied that he knew the others; stated that he had taken them out fishing, and that he knew nothing of the meat.

Neely's defense was that he had at all times refused to have anything to do with stealing cattle; that he knew that he was suspected and that Frye was on the watch, so that there was no hope of getting away with any of the association's cattle

if the attempt was in reality felonious; that he thought Harrington was a "spotter," and told him so; that all he agreed to do, or did, was to furnish the men board and lodging, rent them saddle-horses and boats, and act as a guide, just as he would to any other man seeking accommodation for hire; and that Harrington agreed to pay him the regular rates, and that, in this, Vaughn acted with him and on his suggestion. Neely denied that he boasted of "stealing" cattle, but stated that he matched Harrington's "fish stories" by telling of cattle he and Roy Edwards had "killed" or "butchered" on the range, explaining that his stories were true, but that the cattle killed belonged either to him, Roy Edwards, or the elder Edwards. He testified that, at the rim of Meridian basin, he told Pings and Harrington that they could not get away with stealing those cattle, that Frye was undoubtedly watching them, and sought to dissuade them from going into the basin, and that when, on the 24th, they found the cattle gone from the shore of the lake, he again sought to dissuade them, telling them to let the cattle go.

Vaughn's testimony was along the line of Neely's.

Pings was called as a witness for the defense, and corroborated Neely in so far as he was connected with the subject matter of the latter's testimony.

Although Harrington was in the courtroom during the trial, he was not called by the state, and was only put on the stand by the defense for the purpose of showing his appointment as a stock detective.

Roy Edwards testified that Harrington sought to induce him to "go in" with him (Harrington) but that he refused.

All of the defense testimony was to the effect that Harrington was insistent upon stealing cattle as the ringleader, and that the others assist him for a share in the spoils.

In rebuttal, the prosecution contradicted defense witnesses in certain minor details, and produced a number of witnesses who testified that Neely's reputation for truth, honesty, and integrity was bad.

In argument before this court, counsel for the state explained their failure to put Harrington on the stand by stating that, after August 25, and before the trial, Harrington became so involved in a bank robbery at Harrison, in Madison county, that, the facts being brought out, no jury would believe him under oath.

The only state's witness, other than Harrington, who was in a position to discredit the story told by the defense, was Plante, who was there to hear and see all that he could and thereafter relate it on the stand. His answers, when interrogated on cross-examination as to statements said to have been made by Harrington, Neely and others, which, if made, were damaging to the state's case, were, in the main: "I don't remember"; "I didn't hear it," with an occasional admission tending to substantiate the testimony later given on behalf of the defense. It was only with relation to Vaughn that the witness seemed to be able to make positive denials, although he did contradict Edwards' later testimony in certain particulars.

Nowhere in the state's case does it appear that Neely was a leader in the enterprise or that Harrington was not; the state merely relies upon proof that Neely was caught red-handed with others, but this proof also shows that two out of the four so caught were not red-handed.

It is true that "in a criminal case, the liberty and the rights of the defendant based on fact conditions are largely in the hands of the jury, and when that body has spoken, on a record showing facts sufficient to justify the verdict, if believed by the jurors, the courts are powerless to grant relief from the action of the jury" (*State* v. *Broell,* 87 Mont. 284, 286 Pac. 1108, 1112), but the facts proven must be "sufficient to justify that verdict" by measuring up to the requirements of the law as to what constitutes the crime charged.

It is also true, as asserted by counsel for the prosecution, that the jurors were at liberty to believe only so much of the defendant's testimony as "in their judgment bore the stamp of truth" and to disbelieve other parts, but juries may not arbitrarily and capriciously disregard testimony of wit-

nesses not only unimpeached in any of the usual modes known to the law, but supported by all the circumstances in the case, and, if they do and render a verdict contrary thereto, it is against law, unless it appears that some essential part of the evidence is inherently improbable. (*Harwood* v. *Scott,* 65 Mont. 521, 211 Pac. 316.)

Had Harrington taken the stand and denied the statements of defense witnesses that he was the prime mover or chief actor in the supposed larceny, we could say that the jury determined the matter on conflicting testimony, and therefore we are powerless to grant relief. Had Harrington taken the stand, the result of the prosecution would, doubtless, have been the same. Surely it would have been less of a strain on the credulity of the jurors to call upon them to believe the man, no matter what his acts complained of, than to ask them to believe contrary to undisputed testimony of half a dozen witnesses, not conflicting with any evidence adduced by the state.

In the absence of a statement from Harrington, knowing him to have been in the courtroom, the jury should have been governed by the law that ''evidence is to be estimated not only by its intrinsic weight, but also according to the evidence which it is in the power of one side to produce, and of the other to contradict.'' (Sec. 10672, Rev. Codes 1921.)

However, assuming that the jury did not believe Neely and his witnesses, it is clear from evidence which the jurors could not disregard—testimony by the state's own witnesses—that Harrington was a decoy acting as a state stock detective by the procurement of, and acting under the authority of, the owner of the cattle taken, and that, whatever the agreement among the four who took them, Harrington, and not Neely, became the prime mover in the asportation and slaughter of the steer for the larceny of which Neely and Vaughn were being prosecuted. Under the fact conditions clearly established, disregarding the question of who was the originator of the plan to take and slaughter cattle belonging to Shaw and his associates, the conviction of Neely cannot stand.

Under all the authorites, if Harrington's acts were committed ▉ under the authority vested in him by Shaw, his acts were those of the owner, and constituted consent on the part of the owner to the taking, which consent robs the acts of all concerned in the enterprise of any criminal ingredient, for, in order to constitute the crime of larceny, the property must be taken without the consent of the owner thereof, although the object of the taking is to trap a potential criminal who has no knowledge of the consent and actually intends to commit a crime. (2 Wharton's Criminal Law, 11th ed., sec. 1155; 16 C. J. 90; 3 Chitty's Criminal Law, 925; 1 Brill's Cyc. Criminal Law, secs. 187, 188, and authorities assembled; *Shouquette* v. *State,* 25 Okl. Crim. 169, 219 Pac. 727; *State* v. *Hull,* 33 Or. 56, 72 Am. St. Rep. 694, 54 Pac. 159.) The consent of the owner may be given through an agent given authority sufficiently broad to include it. The owner (Shaw) called as a witness for the defense, testified that Harrington had "full authority, *carte blanche,* to do as he saw fit," but would not say that he had authority to kill the animal. Recalled later for cross-examination, the witness stated that he did not know what *"carte blanche"* meant, and, after qualifying his statements on direct examination, finally indulged in the legal conclusion that Harrington had no authority at all.

It is, however, clear from the evidence that Harrington's authority was to "get in" with Neely and Vaughn for the purpose of trapping them in a larceny of Shaw's cattle, and certainly implied the authority to go with them on any illegal trips they might make for that purpose, and pursuant to that authority he could have legally assisted them in their illegal enterprise.

There can be no doubt but that one against whom a crime is ▉ contemplated may remain silent and permit matters to go on for the purpose of apprehending the criminal, without being held to have consented to the taking of his property, for the consent which will relieve an act of its criminal character must be more than mere passive submission without previous understanding with the criminal. (8 R. C. L. 129,

and note.) The owner of property, or the state, may employ detectives or decoys to secure evidence against those engaged in, or who contemplate, a violation of the law (*State* v. *Wong Hip Chung*, 74 Mont. 523, 241 Pac. 620), and, if the intent originates with, and is carried out by, the person so decoyed or caught, and the detective or decoy goes with him only for the purpose of obtaining evidence, or even assists him in the commission of the crime for the purpose of capturing the criminal in the act, a conviction will be upheld (1 Wharton's Criminal Law, 11th ed., 501; *State* v. *Stickney*, 53 Kan. 308, 42 Am. St. Rep. 284, 36 Pac. 714; *State* v. *Currie*, 13 N. D. 655, 112 Am. St. Rep. 687, 69 L. R. A. 405, 102 N. W. 875, 877,); but in such a case, in order to hold the alleged offender criminally responsible, it is necessary to show that he participated in every essential act necessary to constitute the crime, whether the plan originated with him and the original intent was his (*State* v. *Hayes*, 105 Mo. 76, 24 Am. St. Rep. 360, 16 S. W. 514; *People* v. *Collins*, 53 Cal. 185), or the plan originated with the detective and the intent was by that person instilled in his mind (1 Brill's Cyc. Criminal Law, sec. 188; *Woo Wai* v. *United States*, 223 Fed. 412, 137 C. C. A. 604; *Saunders* v. *People*, 38 Mich. 218).

If, then, Harrington's authority was no greater than was suggested by Shaw's testimony, and the latter's consent did not extend to an actual taking and killing of the animals by Harrington in order to entrap others, and assuming that the original plan emanated from Neely, Harrington ruined the case he was building up when, on his failure to induce Neely to go to Meridian basin and drive out cattle, he himself did so without Neely's assistance.

So narrowing the issue, the position of the decoys in the cases of *State* v. *Hayes* and *People* v. *Collins*, above, was similar to that of Harrington. In each of those cases the defendant solicited another to go in with him on the commission of a burglary; the person solicited informed the proposed victim, who thereupon authorized him to go along for the purpose of catching the thief, but in each case a judgment of conviction

was set aside because, when it came to the actual entry which would otherwise have constituted burglary, the decoy entered, leaving the intending burglar on guard outside.

"The detective must not prompt or urge or lead in the commission of the offense. The defendant must act freely on his own motive" (*State* v. *Currie*, above), and especially must officers of the law not solicit or induce others, although they may be old offenders, to commit criminal acts in order to convict them. Public policy will not justify a conviction where officers induce or procure the defendant to commit an offense which he did not intend to commit. (*Salt Lake City* v. *Robinson*, 40 Utah, 448, 125 Pac. 657; *Woo Wai* v. *United States*, above; *Saunders* v. *People*, above; *People* v. *Harris*, 80 Cal. App. 328, 251 Pac. 823.)

In *Love* v. *People*, 160 Ill. 508, 32 L. R. A. 139, 43 N. E. 710, 713, it is said: "Strong men are sometimes unprepared to cope with temptation and resist encouragement to evil when financially embarrassed and impoverished. A contemplated crime may never be developed into a consummated act. To stimulate unlawful intentions, for the purpose and with the motive of bringing them to maturity, that they may be punished, is a dangerous practice. It is safer law and sounder morals to hold, that where one arranges to have a crime committed against his property or himself, and knows that an attempt is to be made to encourage others to commit the act, * * * by one acting in concert with such owner, that no crime is thus committed."

These authorities dispose of the suggestion that, even though, under the authorities and the facts shown, Neely was not a principal nor an accessory of Harrington, he was an accessory of Pings, and therefore subject to conviction as a principal under the provisions of section 11863, Revised Codes of 1921. Pings was induced by Harrington to go from Butte, where he was out of a job, to Cliff Lake for the avowed purpose of assisting Harrington in the larceny of cattle; he would not otherwise have had anything to do with the affair, and, although he intended to commit a criminal act, under the law

he did not do so, and, as he was not therefore a principal to a crime, Neely could not have become his accessory.

Further than this: Even though, under the above authorities, Neely would have been guilty in spite of Harrington's assistance in the commission of the supposed crime, Neely can only be held guilty on a showing that he himself "did everything necessary to make out a complete offense" (1 Brill's Cyc. Criminal Law, above), or, as it is put in some of the cases, "that he participated in every ingredient of the offense charged."

Here, the principal overt acts constituting the offense were the asportation and butchering of the animal—acts admittedly committed by Harrington and Pings without the assistance of Neely, except as a picket or watcher. Harrington, himself an officer of the law, clearly notified other officers of what was brewing, and they laid in wait to catch the perpetrators of a supposed crime. The law applicable to the facts is that, "when officers of the law are informed that a person intends to commit a crime against the property or person of another, the law permits them to afford opportunities for its commission and to lay traps which may result in the detection of the offender. To this end a person may be engaged to act with the one who is suspected and to be present with him at the time the crime is to be committed; and if the accused, having himself originally conceived the criminal intent, commits such of the overt acts as are necessary to complete the offense, he will not be protected from punishment by reason of the fact that when the acts were done by him the person who was present with the knowledge and approval of the authorities aided and encouraged their perpetration. It is, of course, necessary that the defendant should have directly participated in so much of the entire transaction that the acts which he himself personally committed shall alone be sufficient to make out a complete offense against the law; for no act done by his feigned accomplice may be imputed to him, and if, in order to constitute the offense, it is necessary that something done by the supposed confederate shall be imputed to the accused, then

the prosecution will fail." (*People* v. *Lanzit*, 70 Cal. App. 498, 233 Pac. 816, 820.)

The acts of the detective cannot be imputed to the defendant, as there is a want of community of motive. The one has a criminal intent, while the other is seeking the discovery and punishment of crime. If each overt act necessary to complete the crime is personally done by the defendant and with criminal intent, his guilt is complete, no matter what the motive or intent of the person who is apparently assisting him (*State* v. *Jansen,* 22 Kan. 498), but the detective cannot, without the assistance of the accused, perform any one of the acts necessary to constitute the crime, such as the original asportation, and a conviction stand.

Other questions presented by the numerous assignments of error need not be considered.

The judgment and order are reversed and the cause remanded to the district court of Madison county, with direction to dismiss the information and discharge the defendant from custody.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES GALEN, FORD and ANGSTMAN concur.