STATE, RESPONDENT, v. SNIDER, APPELLANT.

(No. 8,125.)

(Submitted November 15, 1940. Decided December 17, 1940.)

[111 Pac. (2d) 1047.]

312

*Mr. Howard C. Gee* and *Mr. George E. Hurd,* for Appellant, submitted a brief, and argued the cause orally.

*Mr. Harrison J. Freebourn,* Attorney General, *Mr. Carl N. Thompson,* Assistant Attorney General, and *Mr. J. E. McKenna,* County Attorney of Fergus County, for the State, submitted a brief; *Mr. Thompson* and *Mr. McKenna* argued the cause orally.

MR. JUSTICE ARNOLD delivered the opinion of the court.

The defendant was convicted by a jury of the crime of grand larceny in the theft of 56 lambs in Fergus county. He was sentenced to ten years in the state prison, the jury having left the punishment to be fixed by the court. He has appealed from the judgment and the order denying his motion for new trial, specifying eighteen assignments of error.

The first four assignments refer to the insufficiency of the evidence. The next four assignments relate to instructions given the jury, and the next five to instructions refused by the court. The remaining assignments relate to the court's refusal to arrest judgment and refusal to grant a new trial.

The assignments of error go chiefly to two principal grounds, namely, that the taking of the sheep was with the consent of the owner, and that the defendant was illegally entrapped by the owner. These two principal questions were submitted to the jury by the trial court's instruction as follows:

"Instruction No. 17. You are instructed that where the owner, in person or by his agent, originated the design or intent, and solicits the accused to commit a criminal act, and actively urges, co-operates and assists the accused in the com-

mission of the criminal act, such conduct amounts to consent, and the criminal quality of the act is wanting.''

''Instruction No. 20. You are instructed that, if the owner of property, or his agent, merely facilitates the taking of property, for the purpose of securing the detection and punishment of the alleged taker, his acts do not amount to consent to the taking, and larceny is committed by the taker; and the fact that the owner, or his agent, stands by and does not prevent the taking, does not prevent the act from being larceny, nor does the further facts that the owner or his agent so places the property, or takes such other steps as to facilitate the taking thereof.''

''Instruction No. 21. You are instructed that the owner of property, or his agent, may secure evidence against those engaged in or who contemplate a violation of the law; and if the intent originates with and is carried out by the alleged offender, and the owner or agent goes with him only for the purpose of obtaining evidence, or even assists him in the commission of the alleged offense, there will, nevertheless, be a violation of the law, but in such case, in order to hold the alleged offender criminally responsible, it is necessary to show that he participated in every essential act necessary to constitute the offense.''

''Instruction No. 22. You are instructed that the fact that the agent of an owner acts as a supposed confederate of the alleged offender is no defense to the latter in a prosecution for larceny, provided the original design was formed independently of such agent and the alleged offender participated in every essential act necessary to constitute the offense.''

''Instruction No. 23. You are instructed that one against whom a crime is contemplated may remain silent and permit matters to go on, for the purpose of apprehending the alleged criminal, without being held to have consented to the taking of his property, for the consent which will relieve an act of its criminal character must be more than mere passive submission, without previous understanding with the alleged offender.''

''Instruction No. 24. You are instructed that a taking by the voluntary consent of the owner, or his authorized servant or agent, even though with a felonious intent, does not consti-

tute larceny; but where the criminal design originates with the accused and the owner does not, in person or by an agent or servant, suggest the design nor actively urge the accused to the commission of the offense, the mere fact that such owner, suspecting that the accused intends to steal his property, in person or through a servant or agent, exposes the property or neglects to protect it, or furnishes facilities for the execution of the criminal design under the expectation that the accused will take the property, or avail himself of the facilities furnished, will not amount to a consent in law, even though the agent or servant of such owner, by his instruction, appears to co-operate in the execution of the crime.''

These instructions, in view of the evidence hereinafter adverted to, were sufficient to present the case to the jury so far as the question of consent and entrapment were involved.

Both prosecution and defense rely upon the Montana case of *State* v. *Neely,* 90 Mont. 199, 300 Pac. 561, and the foregoing instructions were based to a considerable extent on the law as laid down in that case. There this court said: ''There can be no doubt but that one against whom a crime is contemplated may remain silent and permit matters to go on for the purpose of apprehending the criminal, without being held to have consented to the taking of his property, for the consent which will relieve an act of its criminal character must be more than passive submission without previous understanding with the criminal. (8 R. C. L. 129, and note.) The owner of property or the state may employ detectives or decoys to secure evidence against those engaged in or who contemplate, a violation of the law (*State* v. *Wong Hip Chung,* 74 Mont. 523, 241 Pac. 620), and, if the intent originates with, and is carried out by, the person so decoyed, or caught, and the detective or decoy goes with him only for the purpose of obtaining evidence, or even assists him in the commission of the crime for the purpose of capturing the criminal in the act, a conviction will be upheld. (1 Wharton's Criminal Law, 11th ed. 501; *State* v. *Stickney,* 53 Kan. 308, 36 Pac. 714, 42 Am. St. Rep. 284; *State* v. *Currie,* 13 N. D. 655, 102 N. W. 875, 877, 112 Am. St. Rep. 687, 69 L. R. A. 405);

but in such a case, in order to hold the offender criminally responsible, it is necessary to show that he participated in every essential act necessary to constitute the crime, whether the plan originated with him and the original intent was his (*State* v. *Hayes,* 105 Mo. 76, 16 S. W. 514, 24 Am. St. Rep. 360; *People* v. *Collins,* 53 Cal. 185), or the plan originated with the detective and the intent was by that person instilled in his mind (1 Brill's Cyc. Criminal Law, sec. 188; *Woo Wai* v. *United States,* 223 Fed. 412, 137 C. C. A. 604; *Saunders* v. *People,* 38 Mich. 218).''

In 15 American Jurisprudence, paragraph 334, page 23, the law is stated as follows: ''No offense is committed where a person arranges for a crime to be committed against himself or his property and aids, encourages, or solicits the commission thereof. A charge of larceny cannot be based on a taking of property with the consent of the owner, and for the same reason a taking of money or goods from one's person is not robbery, if it is done with his consent. If the owner or someone representing the owner induces a person to commit a burglary in order that such person may be apprehended, he may set up the entrapment as a defense. However, if a person does not induce, encourage, aid, or advise the commission of a crime against himself or his property, he may wait passively for a would-be criminal to perpetrate an offense or create the condition under which an offense against the public may be committed. One who knows of a crime contemplated against him may remain silent and permit matters to go on, for the purpose of apprehending the criminal, without being held to have assented to the act.''

On entrapment we find the following rule laid down in the same volume, paragraph 335, page 24: ''It is not ordinarily permissible for any person, in order to secure the conviction of another on a criminal charge, to procure him to do the act. But there is a very clear distinction between inducing a person to do an unlawful act and setting a trap to catch him in the execution of criminal designs of his own conception.'' In paragraph 336, page 25, of the same volume we find this language: ''As a general rule, if the criminal intent originates in the mind of the entrapping person and the accused is lured into the com-

mission of the offense charged in order to prosecute him therefor, no conviction may be had, though the criminality of the act is not affected by any question of consent.''

In the case of *Sorrells* v. *United States*, 287 U. S. 435, 53 Sup. Ct. 210, 77 L. Ed. 413, 86 A. L. R. 249, the rule is laid down that where officers or employees of the government merely afford opportunities or facilities for the commission of an offense, such action does not defeat a prosecution for the offense.

It is necessary, therefore, for us to review the evidence and determine if it was sufficient in law for the jury to find that criminal intent originated in the mind of the defendant, and also if the entrapment was passive, as distinguished from active, within the meaning of the foregoing rules of law.

The testimony of the defendant Snider, considered in connection with other testimony some of which stands uncontradicted, was sufficient to warrant the jury in finding the defendant guilty of larceny. He testified that he had known John Berg, the owner of the sheep, for many years; knew that he was the owner of both sheep and lambs, and knew that the witness Creathbaum was Berg's sheepherder. The defendant further testified that he and his employee, Lenling, who also was informed against for the same crime for which the defendant was prosecuted, went to the sheep barn in the night time where the sheep were located according to pre-arrangement with Creathbaum. There is a conflict of testimony as to the nature of these pre-arrangements. Creathbaum testified that he was first approached by Snider while he, Creathbaum, was herding the sheep; that Snider talked of buying sheep, then made a suggestion that if Creathbaum would permit him to load the lambs, Snider would give him twenty head of ewes for every load of lambs. Creathbaum told him, according to his testimony, that all the sheepmen about there knew him and knew he had no sheep; that he could produce no bill of sale and that he would be in wrong. Other conversation followed, resulting in an agreement for a ''three way split'' of the proceeds. Snider, on the other hand, denied making any arrangement for theft of the lambs. He testified that

Creathbaum said the lambs were his, and further that the transaction was a purchase.

Creathbaum testified that he had personally driven the sheep four times to the barn at defendant's request, where finally defendant and Lenling sorted out what they wanted and placed them in the barn. Creathbaum testified that he took no part in the placing of the sheep in the barn and was not present when they were loaded. Here the defendant and Lenling loaded 54 lambs into a truck and hauled them away, intending to sell them to a Great Falls meat company. Neither Creathbaum nor Berg was present at the time of the loading, although there is some testimony that Creathbaum had previously made some panels to facilitate placing the sheep in the barn. It is also in evidence that prior to going to the sheep barn, the defendant removed the dual wheels from the rear of his truck. Snider explained the removal of the dual wheels as follows: ''I had a conversation on the 4th of October with Mr. Creathbaum on the Grass Range-Roy road where I met him. When we drove up he said, 'Can we get them sheep out tonight? Have you got a truck?' and I said 'Yes.' He says, 'I will have them down in the shed by eight o'clock,' he says, 'Has the truck got dual wheels on it?' I said, 'Yes.' He said, 'Take them dual wheels off before you go up to the shed. I don't want any dual wheel tracks shown up to the shed.' ''

Lenling testified regarding the removal of the dual wheels as follows: ''Snider and Creathbaum had a conversation in my presence. When Creathbaum came up to the car he asked Snider if he had a truck and Snider said he did, and Creathbaum told him he had these panels built at the shed, and he could deliver those sheep to him that night some time around eight o'clock, and he asked Snider if this truck had dual wheels on, and Snider said it did, and he said, 'Well, take those off before you come up to the shed, because I don't want no truck tracks around the shed.' That is what he said at that time and place.''

Creathbaum's testimony concerning the removal of the dual wheels is as follows: ''Lenling came out that night. When he

came out on the night of the 27th I was in bed at my camp. It was after ten o'clock when they came. I had a conversation with them there at the camp. He wanted to load—wanted a truckload of sheep. I told him it would be impossible to load them that night, that they hadn't come early and helped me to get them in the corral, as they had agreed, and that it was raining, .and Mr. Lenling had stated before they hadn't taken the dual wheels off the truck that night, as they had agreed to, and owing to those conditions I refused to load him out that night because Mr. Snider was not with him. Mr. Lenling came to my camp alone."

Defendant had received no bill of sale for the sheep and made no arrangements with Berg for their purchase. He had agreed with Creathbaum that the proceeds of the sale would be split three ways—one-third to defendant, one-third to Creathbaum, and one-third to the trucker. The record also discloses that when defendant first looked at the sheep with Creathbaum, and when they were finally taken, devious routes were used in order to avoid being observed.

The record of the case discloses that the defendant attempted to stand on two theories which were inconsistent from a factual standpoint. First, that he was merely purchasing the sheep from the sheepherder, and, second, that he had been illegally entrapped and that the sheep had been taken with the consent of the owner.

The defendant and his employee, Lenling, were apprehended by the sheriff and his aides after they had driven about a mile and a half with the load of sheep. Berg, the owner of the sheep, testified that his sheepherder, Creathbaum, had informed him of the plan of Snider to steal the sheep and that he had replied to Creathbaum as follows: "I told him to let them alone if they were to steal the sheep." Creathbaum's testimony as to this conversation is as follows: "When Mr. Berg came down that morning I told Mr. Berg and Thor Nelson both the plans that were made to haul the sheep away. Mr. Berg told me if they came after the sheep to let them load them."

The jury resolved the questions of fact relating to the consent and entrapment, and purchase or theft against the defendant upon testimony in some respects conflicting; yet, we believe that defendant's own testimony clearly shows guilty knowledge and criminal intent. Transacting the business in the night time; removing the dual wheels from the truck; dealing with the sheepherder instead of the owner; and omitting to get a bill of sale when he knew, or should have known, that the sheep belonged to Berg, all point toward criminal intent and guilty knowledge, to say nothing of the defendant's furtive manner in acquiring the sheep. We believe the evidence fully justifies the verdict of the jury. The acts of the owner of the sheep and his agent Creathbaum did not constitute inducement to commit a crime, nor aid in formulating a design to steal. At most the owner and his agent remained silent, failed to place obstacles in the way of defendant, and afforded him facilities whereby he could carry out his own criminal design, without giving his consent to take the property, as that term is used in questions of entrapment. This they had a right to do in seeking to entrap a criminal. The trial court studiously and zealously guarded the right of defendant throughout the trial.

We have examined the instructions which were proposed by defendant and refused by the court, and believe no error was committed by the refusal. All questions were fully submitted to the jury by the instructions given.

The defendant complains that the evidence does not justify the sentence imposed. While the sentence of ten years for stealing 56 lambs is the maximum penalty for manslaughter, and the minimum penalty for second degree murder, this court has on previous occasions laid down the rule that it would not reduce the sentence imposed by a trial court so long as the sentence was within the limit fixed by statute. (*State* v. *Willette,* 46 Mont. 326, 127 Pac. 1013; *State* v. *Fowler,* 59 Mont. 346, 196 Pac. 992, 197 Pac. 847; *State* v. *Schaffer,* 59 Mont. 463, 197 Pac. 986.)

In some jurisdictions where the power of the appellate court is defined by statutes similar to ours, courts have reduced what

320

appeared to be "Draconian" penalties, but we adhere to our previous position and point out that any relief from such a sentence must come from the board of pardons.

The judgment and order denying a new trial are affirmed.

MR. CHIEF JUSTICE JOHNSON and ASSOCIATE JUSTICES MORRIS, ANGSTMAN and ERICKSON concur.