UNITED STATES, Appellee

v

EUGENE W. CASSEY, Technical Sergeant, U. S. Air Force, Appellant

14 USCMA 558, 34 CMR 338

No. 17,384

May 28, 1964

*Lieutenant Colonel Andrew S. Horton* argued the cause for Appellant, Accused. With him on the brief was *Colonel Daniel E. Henderson, Jr.*

*Captain Donald W. Brewer* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a special court-martial convened by the Commander, 3970th Combat Support Group (SAC), United States Air Force, at Torrejon Air Base, Spain, the accused pleaded guilty to a charge of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921. He was duly found guilty and sentenced to bad-conduct discharge, forfeiture of $48.00 per month for six months, and reduction to the grade of Airman Basic. Intermediate appellate authorities affirmed, with some reduction in the sentence, and we granted accused's petition for review upon the following issues:

"1. Whether as a matter of law the stipulated facts (Exhibits 1 and 2) show the accused to be guilty of the larceny charged or of an attempt to commit larceny.

"2. Whether the Board of Review erred in not requiring briefs and oral argument."

Subsequent to our grant, it was made known to the Court by the parties that, in light of the accused's request for appellate representation and assignment of undue severity of his sentence as error, oral argument thereon was in fact had. Moreover, following the decision of the board of review in the premises, the Commander, Eastern Transport Air Force (MATS), reduced the forfeitures imposed and remitted the bad-conduct discharge, thus affording him relief in excess of that which he sought. In light of these developments, we pursue the second issue no further. Cf. United States v Cieslak, 13 USCMA 216, 32 CMR 216; United States v Anderson, 14 USCMA 515, 34 CMR 295.

Turning to the merits of the case, we note at the outset that the question before us involves basically whether there is any contradiction between the stipulated proof and the accused's plea of guilty, for, as we noted in United States v Thompson, 13 USCMA 395, 32 CMR 395, at page 397:

**559**

"It is not necessary that stipulated evidence establish an accused's guilt in order that his plea of guilty be upheld. . . .

"We approach the problem before us, therefore, on the basis that stipulated evidence must *negative* accused's guilt . . . in order to set aside his plea."

According to the stipulations of testimony, accused approached Airman First Class Joseph F. A. LeBlanc on March 27, 1963, and informed him "if I could get him some sheets it would mean some extra money for me." LeBlanc's duties involved the issuance of linens to persons living on Torrejon Air Base. He was "usually the person designated from my section to make the turn-ins to the salvage yard," at which accused worked, and had met Cassey during the course of turning in equipment.

LeBlanc told accused he "would think it over," and accused asked to meet him on April 1, 1963, at the salvage yard "to discuss the details."

On April 1, LeBlanc informed the Office of Special Investigations of accused's solicitation. He was directed not to contact Sergeant Cassey but to advise agents if Cassey again approached him. On the same day, Cassey called LeBlanc and arranged once more for a rendezvous at the salvage yard. There, he informed LeBlanc that he could dispose of new sheets or sheets in good condition to one Martinez who worked on the Base and whose wife operated a linen shop in Madrid. Cassey further explained that LeBlanc's disposition of the sheets would be covered "by crediting me as turning in salvage sheets for rags." The sheets so handled would be sold for 80 pesetas and the proceeds divided between Cassey, Martinez and LeBlanc.

LeBlanc received several more telephone calls from Cassey and met him again in his office at the salvage yard on April 3. On the latter occasion, he agreed to furnish Cassey with 100 sheets. At all times, LeBlanc kept the OSI informed of the discussions with the accused. On April 5, its agents arranged to have all personnel dismissed from LeBlanc's section, marked 100 sheets, and placed them in identifiable boxes. LeBlanc placed the boxes of sheets in his automobile and drove to the salvage yard where "I took the 4 boxes of sheets out of my car and Sgt Cassey put them in his car." LeBlanc then left the salvage yard.

LeBlanc's testimony was corroborated by the stipulated evidence of Special Agent Richard Gordon, whose declarations also established the apprehension of the accused at the Main Gate, Torrejon Air Base, and the discovery of the four marked boxes of sheets in the trunk of his vehicle.

In addition, accused's pretrial statement, voluntarily obtained after proper warning under Code, supra, Article 31, 10 USC § 831, was introduced in evidence. Therein, accused, after detailing his arrangements with Martinez to dispose of the sheets, declared:

". . . I talked to LeBlanc near the base Commisary [sic] last friday afternoon and he said he would try to go along with me. Since friday we have talked about this and then today at about 20 minutes to five in the afternoon LeBlanc called me and said he had some sheets which he would deliver to me. The plan was for me to prepare a slip for LeBlanc indicating that he had turned in some rags and he would then be cleared and not have a shortage in his supply. LeBlanc and I agreed to get as many as we could because MARTINEZ told me that he could sell as many as we could get to him. MARTINEZ SUGGESTED THE PLAN TO ME.

"At about 1710 hours, 5 April 1963, LeBlanc arrived at my place of duty at the Salvage Yard, Torrejon AB and informed me that he had with him 100 sheets. We both then took the sheets from LeBlanc's car and placed them into my car. These sheets were in four boxes which LeBlanc had made up."

From the foregoing, it will be seen that the agreement which accused had with Airman First Class LeBlanc involved the latter's delivery to him at the salvage yard of Government owned sheets, in either new or good condition,

and accused's preparation of a false receipt to LeBlanc for such property, indicating its turn-in as salvaged rags. But LeBlanc's agreement to the scheme was only apparent, as he had notified the Office of Special Investigations, and the delivery of the sheets was actually accomplished only with its acquiescence in accused's scheme. It is for this reason that the defense urges improvidency of accused's plea of guilty to larceny, declaring that no such offense was committed either because the United States, through its agents, consented to the taking or because the needed asportation was incomplete. We disagree.

The facts set out above establish accused's exercise of dominion over the sheets and, hence, their asportation. United States v Tamas, 6 USCMA 502, 20 CMR 218. The *Tamas* case likewise discusses the other argument presented by appellant. There, it appeared that the accused asked one Jones, an armorer, to procure a pistol for him from the armory. Jones agreed to consider the proposition but, instead, notified military authorities. They directed him to comply with accused's request if he again broached the matter. When accused once more sought to obtain the weapon, Jones ostensibly fell in with his desires, obtained a pistol from the Provost Marshal, and delivered it to accused in a local bar. Immediately thereafter, accused was apprehended with the weapon in his possession. This Court unanimously held the evidence was sufficient to establish accused's guilt of larceny, saying, at page 507:

> "It is hornbook law that no larceny is committed in a situation where an owner of property, or a decoy employed by him in an attempt to ensnare the thief, so participates in the commission of the act as to prevent the accused from doing everything necessary to commit the crime. It is vital to the commission of an offense that an accused participate directly in enough of the transaction so that the acts with which he is chargeable personally are sufficient to make out a complete offense. State

v Neely, 90 Mont 199, 300 Pac 561 (1931); Annotation, 86 ALR 263, 270.

. . . . . .

> "The difficulty with defense counsel's argument is that the facts in this record do not bring this case within the rule admittedly applicable. To support his assertion, counsel must read into the acts done by Jones and the Marine Corps authorities a consent which they could not give, and which the accused knew could not be given. The pistol was the property of the United States Government, not of Jones or Sergeant Grantham, and they could neither give the pistol away nor permit the accused to take or dispose of it. Had Jones and the Marine Corps authorities not acted with innocent intentions, they would have been guilty of larceny. Granted that under their method of operation they committed no offense, that does not furnish support for a holding that they possessed the power to consent to the taking by the accused. Nothing in Marine Corps Regulations, military law, customs of the service, or the Manual for Courts-Martial authorizes the delivery of property under these circumstances, and we are satisfied that consent could not be given to such an arrangement. It follows that the Government did not consent to the taking and the essential element of trespass was not negatived. United States v Buck, supra; People v Mills, 178 NY 274, 70 NE 786 (1904)."

In United States v Buck, 3 USCMA 341, 12 CMR 97, a similar situation was presented. There, Buck offered to buy a large quantity of Government-owned chevrons from a Sergeant Hatley, who was assigned to supply duties. Hatley temporized and told the accused to return the next day. He then informed his superiors of the solicitation and was directed to deliver the chevrons to the accused upon his return. When Buck called the next day, Hatley informed him that the chevrons were ready and delivered three cartons to a loading door. Accused placed the cartons in his car. The entire proceedings

were watched by criminal investigators who attempted to follow accused upon his departure. He evaded them, and, when later arrested off post, did not have the Government property in his possession. The chevrons were later returned to the Government through the agency of accused's civilian counsel.

Pointing out that, if these facts were to support larceny, it must be upon the basis of a wrongful taking, with intent to steal, this Court declared, at page 345:

"The determination of the question of consent to the taking depends upon the authority of the officers, and of the supply sergeant, over the Government property involved. State v Neely, *supra.* The authority of the accountable officer, and of the officer in charge of the section, is found in pertinent provisions of the Marine Corps Manual, defining with great particularity the management, control, issue, and disposal of property. Neither expressly nor by implication does the Manual authorize the delivery of any property under the circumstances herein involved. Nor could the advice of the legal officer, who counselled them in the course they pursued, confer such authority. Whether the officers and Hatley intended to surrender possession outright, or solely to catch an offender, their actions could not bind the Government. Since each lacked the power to surrender possession, the Government did not consent to the taking, and no essential element of the crime was negatived. People v Mills, 178 NY 274, 70 NE 786."

These decisions have not heretofore been placed in question and we, upon a careful reexamination, adhere to the conclusions reached therein. While such serves to dispose of the position of appellate counsel for the accused, we add, however, that both United States v Tamas, supra, and United States v Buck, supra, are solidly supported by authorities from other jurisdictions. See, generally, the cases collected in Annotations, 18 ALR 146, 66 ALR 503, 86 ALR 265.

Thus, in People v Hanselman, 76 Cal

460, 18 Pac 425 (1888), it was said, at page 426:

". . . It is, no doubt, true, as a general proposition, that larceny is not committed when the property is taken with the consent of its owner, but it is difficult, in some instances, to determine whether certain acts constitute, in law, such 'consent;' and, under the authorities, we do not think that there is such consent where there is mere passive submission on the part of the owner of the goods taken, and no indication that he wishes them taken, and no knowledge by the taker that the owner wishes them taken, and no mutual understanding between the two, and no active measures of inducement employed for the purpose of leading into temptation, and no preconcert whatever between the thief and the owner. And some of the circumstances were present in all the cases cited by counsel for appellant."

So also "where the owner has been notified of a design formed to steal his goods, which intent he did not originate or suggest, he may, in order to detect the thief, direct his servant or agent to encourage the design, and afford facilities for the completion of the crime; and . . . the facilities afforded under such circumstances will not affect the criminality of the thief." State v Duncan, 8 Rob 562 (La) (1844). In short, the state of the law has been accurately summarized as follows:

"It is well established that where the criminal design originates with the accused, and the owner does not, in person or by an agent or servant, suggest the design or actively urge the accused on to the commission of the crime, the mere fact that the owner, suspecting that the accused intends to steal his property, in person or through a servant or agent, exposes the property, or neglects to protect it, or furnishes facilities for the execution of the criminal design, under the expectation that the accused will take the property, or avail himself of the facilities furnished, will not amount to a consent in law,

even though the agent or servant of the owner, by his instructions, appears to cooperate in the execution of the crime. . . ." [Annotation, 18 ALR 146, 172.]

In the case before us, it cannot be denied the stipulated evidence establishes beyond cavil that the ▆▆▆▆▆ criminal design in question originated with the accused and Martinez rather than with any agent of the United States. It was his scheme and not that of Airman LeBlanc or the Office of Special Investigations, and it was pursuant to his instructions that the sheets were to be delivered to the salvage yard and LeBlanc's accounts cleared by a receipt therefrom for rags. Such proof furnishes no inconsistency with accused's plea of guilty to larceny. United States v Tamas, supra; United States v Buck, supra. The Government's agents did not induce the crime, nor did they urge the accused on in its commission. Sor-

rells v United States, 287 US 435, 77 L ed 413, 53 S Ct 210 (1932); United States v McGlenn, 8 USCMA 286, 24 CMR 96. No more was provided than an opportunity for him to rush headlong to his own destruction. While representatives of law enforcement may here be criticized for failing to carry out their primary task of preventing crime by actively interfering with the accused immediately upon the report of his solicitation, see concurring opinion of Chief Judge Quinn, United States v Tamas, supra, permitting his plan to be carried forward to fruition offers no legal impediment to acceptance of his provident plea of guilty. We, therefore, find no merit in the issues upon which we granted accused's petition for review.

The decision of the board of review is affirmed.

Chief Judge QUINN and Judge KILDAY concur.