UNITED STATES, Appellant

v

WILLIAM C. SNEED, JR., Staff Sergeant,
U. S. Army, Appellee

17 USCMA 451, 38 CMR 249

*Captain R. Kevin McHugh* argued the cause for Appellant, United States. With him on the brief were *Lieutenant Colonel David Rarick* and *Major John F. Webb, Jr.*

*Captain Dennis R. Hunt* argued the cause for Appellee, Accused. With him on the brief were *Colonel Daniel T. Ghent, Lieutenant Colonel Martin S. Drucker,* and *Major David J. Passamaneck.*

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial in Korea convicted the accused of larceny of Government property, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and imposed a sentence extending to a dishonorable discharge and confinement at hard labor for three years. On review, a board of review modified the findings of guilty by affirming only the lesser offense of attempted larceny, in violation of Article 80, Code, supra, 10 USC § 880, and changed the sentence by reducing the period of forfeitures and confinement to two years. The modification of the findings of guilty was predicated upon the board of review's determination that certain instructions by the law officer were erroneous in that they indicated that acts of Government " 'decoys' " could properly be attributed to the accused. Pursuant to Article 67(b)(2), Code, supra, 10 USC § 867, the Judge Advocate General of the Army certified the following question for our consideration:

Was the board correct in holding as a matter of law that the acts of a "decoy" may not be imputed to the accused.

The accused, a noncommissioned officer with fourteen years of honorable service, was the assistant enlisted officer in charge of receiving incoming supplies at the Multipack Section of the United States Army Ascom Depot, Korea. According to the testimony of Government witnesses, he approached Specialist Four Michael J. Kelley, an assistant noncommissioned officer in charge of the receiving ramp, and asked him if he would join in the theft of property from the depot for sale to Koreans; he also proposed that Kelley speak to Specialist Four Norman S. Cabral, Jr., who had "access" to motor vehicles, to determine if "he would drive a truck" for them. Kelley talked to Cabral. As a result of their conversation, Staff Sergeant James Bowling, the noncommissioned officer in charge of the section, was informed of the accused's proposal. Eventually, and in turn, Lieutenant Charles M. Moye, the officer in charge of the section, Lieutenant McClory, the depot security officer, and Criminal Investigations Detachment agents were apprised of the matter. They instructed Cabral and Kelley to "go ahead" and do "whatever Sneed asked."[1]

Several days after the accused's initial overture, the crucial events took place. According to Kelley, he put aside two refrigerators and two pallets of trousers on the morning of August 1, 1966. When he advised the accused of what he had done, the ac-

---

[1] The record of trial suggests that none of these responsible officials considered the alternative of preventing the lesser offense from developing into a major crime. United States v Cassey, 14 USCMA 558, 563, 34 CMR 338.

cused remarked that these were "good items." He told Kelley he would go to the village "to get things set up." Kelley then told Cabral the accused was ready to move. Cabral passed the information to Sergeant Bowling, and he arranged for Cabral to obtain a truck. Bowling also alerted Lieutenant Moye and the CID office, and agents "positioned" themselves at Gate Number 4.

About one o'clock that afternoon, the accused appeared at Kelley's place of duty. He told Kelley to load the truck while he obtained a gate pass. Then he went to Cabral and told him to get a pass. Cabral proceeded to the office and received from Lieutenant Moye a signed, blank pass. The pass was given to the accused, who inserted the appropriate information in the various blank spaces. Normally, the removal of refrigerators and trousers from the receiving section did not require a gate pass because, routinely, they were transferred to other buildings in the depot area. Napkins, however, were stored in a different compound, and their transfer required a gate pass. Apparently mindful of these circumstances, the accused told Kelley to place some containers of napkins on the truck so that the load would not "be so noticeable." He added this item to the gate pass, and gave the pass to Kelley. He also obtained permission from Sergeant Bowling to ride in the truck to its destination, for the alleged purpose of visiting a friend. He, Cabral, and Kelley entered the cab of the truck, and, with Cabral driving, proceeded to Gate Number 4. The truck was stopped by CID agents, and the accused was arrested.

Reviewing the record, the board of review noted the law officer had instructed the court members that they could convict the accused if he had "counseled or procured" the theft of the Government property. It concluded that this theory of responsibility was "spurious." As it viewed the evidence, Cabral and Kelley were either "government agents or, 'decoys.' " As agents or decoys, their conduct in taking and transferring the Government property was not illegal, and could not be imputed to the accused as criminal conduct.[2] The Government challenges this determination on the ground that a person is not insulated from liability for a criminal act merely because he uses an innocent agent to perform the act.

Article 77(1), Code, supra, 10 USC § 877, condemns as a principal anyone who personally commits the offense charged, or who "aids, abets, counsels, commands, or procures its commission." Under the Article, therefore, one who causes the commission of the offense " 'by an innocent agent or instrumentality' " is guilty as a principal, " 'even though he intentionally refrained from the direct act constituting the completed offense.' " United States v Wooten, 1 USCMA 358, 362, 3 CMR 92, footnote 1. The testimony of the Government witnesses demonstrates the accused proposed the theft of Government property. It also demonstrates the accused caused Kelley to load the truck with Government property and caused Cabral to drive it away from the receiving section, with the intent to permanently deprive the Government of the property. The question is whether these acts by Kelley and Cabral constitute the exercise of improper dominion and control over the property so as to constitute a wrongful taking, within the meaning of Article 121. The board of review held they did not. We agree.

In United States v Buck, 3 USCMA 341, 12 CMR 97, the accused was convicted of larceny of Government property. According to the evidence, he proposed to a sergeant in the supply office at Camp Pendleton that the sergeant deliver to him a large quantity of chevrons, in return for $50.00. The sergeant feigned agreement. He reported the solicitation to his superiors, and arrangements were made to appre-

---

[2] The board of review, however, determined that personal acts by the accused were sufficient to support findings of guilty of the lesser offense of attempted larceny.

hend the accused if a transfer eventuated. The next day the accused came again to the supply room. He carried away three cartons of chevrons, which had been left at the door of the supply room, and placed them in the trunk of his car. Then he drove away. On review of the record of trial, a board of review held that the accused had not committed larceny because his " 'taking [of the chevrons] was not a trespass and was with the consent of the custodian.' " We reversed that ruling, but our reasons support the conclusion of the board of review in this case. *Id.,* at page 343.

We pointed out that there are three common situations in which persons in authority appear to support the commission of an offense for the purpose of apprehending the criminal. In the first, the authorities merely allow "one intent upon the commission of crime" to carry out his purpose without hindrance, for example, by leaving property a thief wants to steal in a seemingly unguarded place; in the second, the accused also intends its commission the crime and proposes its commission to persons who, unknown to him, are associated with law enforcement; these "abuse" their role in the later transaction by conduct which results in "negativing an essential element of the crime"; and, in the third situation, the authorities, rather than the accused, conceive the offense, and "lure an otherwise innocent man to its accomplishment." Reviewing the evidence against Buck, we distinguished his personal acts from those of the supply sergeant. We especially called attention to the fact that the sergeant's removal of the chevrons from the stock room shelves, and his placement of them at the door of the supply building, did not constitute a wrongful taking because the articles "were still in the possession of the Government." *Id.,* at pages 343, 344. We contrasted these acts with Buck's exercise of dominion and control by removing the boxes from the supply room, placing them in the trunk of his own car, and driving off with them. We held Buck's acts constituted a wrongful taking. The accused in this case did not have

possession or control over the articles taken from the receiving section, as Buck had over the boxes of chevrons. The articles were selected by Kelley, and loaded on the truck by him. The truck was obtained by Cabral, and throughout the incident remained in his possession and under his control. While the articles were transported from the receiving section to Gate Number 4, they were never out of the Government's control. All the acts performed by Kelley and Cabral were themselves legal, and none constituted a wrongful taking or asportation of the property. The conduct of the Government's accomplices, therefore, resulted in "negativing an essential element of the crime," and brought the case within the second of the three situations discussed in the *Buck* case.

Two other cases decided by this Court support the board of review's conclusion. In United States v Tamas, 6 USCMA 502, 20 CMR 218, the accused was convicted *inter alia* of larceny of a pistol. The record indicated he had solicited Private First Class Thomas Jones, who was assigned to the company armory, to get a .45 caliber pistol for him. Jones notified his superiors. Several days later, the accused repeated his request, and Jones agreed to obtain the weapon. He secured a gun from Sergeant Grantham of the Provost Marshal's office, and later, at a local bar, passed it to the accused. The accused concealed it on his person. He was then arrested. On appeal, the accused contended there had been no wrongful taking because he acquired the pistol with the consent of the local military authorities. While observing it is "hornbook law" that no larceny results when "an owner of property, or a decoy . . . so participates in the commission of the act as to prevent the accused from doing everything necessary to commit the crime," we rejected the contention. We noted the transfer of the pistol to the accused was not consensual because neither Jones nor Grantham could "give the pistol away nor permit the accused to take or dispose of it"; these persons did not possess "the power to consent

454

to the *taking by the accused.*" (Emphasis supplied.) *Id.*, at page 507. The point of difference between *Tamas* and this case is that the accused here never acquired possession of the Government's property. At all times the property remained in possession of the feigned accomplices.

In United States v Cassey, 14 USCMA 558, 34 CMR 338, the accused entered a plea of guilty to larceny. On appeal, he contended that a stipulation of facts negatived his guilt. It appeared from the stipulation that he proposed a scheme for transfer of Government linens to salvage as a preliminary to sale to civilians. The proposal was reported to the Office of Special Investigations. One hundred linen sheets were marked and brought to the accused's section. The accused placed the sheets in the trunk of his own car. Later, as he attempted to leave the base by the main gate, he was stopped and arrested. In this Court, the accused argued that the stipulation demonstrated he had obtained the linen sheets by consent and, therefore, there was no wrongful taking or asportation. We held the stipulated facts established the "accused's exercise of dominion over the sheets and, hence, their asportation." No similar evidence of asportation by the accused appears in this case. *Id.*, at page 561.

Our opinion in *Cassey* notes that the decisions in this Court were "solidly supported by authorities from other jurisdictions. See, generally, . . . Annotations, 18 ALR 146, 66 ALR 503, 86 ALR 265." *Id.*, at page 562. Most of the cases relied upon by the Government are not to the contrary. The principal precedent, People v Mills, 178 NY 274, 70 NE 786 (1904), was cited with approval in our *Buck* case, at page 345. It held that indictments removed from the courthouse by the district attorney could not lawfully be turned over to the defendant; as a result, when the defendant received the indictments from the district attorney's representative, his possession was wrongful and violative of the statute regulating the custody of indictments. Similarly, in United States v Giles, 300 US 41, 81 L ed 493, 57 S Ct 340 (1937), entries made by an unsuspecting bookkeeper in the books of a bank, as a result of the accused's deliberate withholding of deposit slips, were, in fact, false. In People v Lanzit, 70 Cal App 498, 233 Pac 816, 819, 821 (1924), the question was the sufficiency of the evidence to support a finding of guilty of attempted murder, not whether the acts of the feigned accomplice could be imputed to the accused. The court specifically determined that the "overt acts personally performed" by the defendant "of themselves were sufficient to constitute" the offense. In Commonwealth v Seybert, 4 Pa. Co. Ct. Rep. 152 (1887), the accused solicited a police officer to commit a burglary with him. The policeman broke into the premises by himself, without an intent to commit any crime therein. However, the entry effected by him was without the owner's consent and, therefore, unlawful. Cf. Seiden v State, 3 Tex App 153, cited in *Buck,* supra, at page 344.

We answer the certified question in the affirmative, and affirm the decision of the board of review.

Judges FERGUSON and KILDAY concur.