## Parker v. Commonwealth.

(Decided March 22, 1918.)

### Appeal from Jackson Circuit Court.

1.    Homicide—Dying Declarations.—Although a statement made by a dying man is improperly admitted as his dying declaration upon the trial of the accused, yet this is not reversible error if other

witnesses competent to testify upon the subject detail the same facts to the jury.

2. Homicide—Dying Declarations.—Where one mortally wounded by a gunshot, and who in great agony inquires if the doctor has come and says: "If he don't come pretty quick I can not stand it in this shape;" and further uses expressions that indicate what he will do to his assailant in case of his recovery, his statement as to how the shooting took place is not admissible evidence upon the trial of the accused as his dying declaration although he die shortly thereafter.

3. Homicide—Evidence—Instructions.—An instruction which directs the jury to find the accused guilty of willful murder although the jury believe from the evidence beyond a reasonable doubt that the shot, which took the life of the deceased, was fired in sudden heat of passion or sudden affray by one jointly indicted with the accused, if the jury further believe from the evidence beyond a reasonable doubt that the accused willfully, feloniously and with malice aforethought aided, abetted and incited the killing, properly presents the law of the case.

4. Homicide—Evidence—Degree of Offense.—One may be found guilty of willful murder even though he be guilty only of aiding, abetting and inciting the killing, if his acts were done with malice aforethought and this, too, though the shot was feloniously fired by his co-defendant in sudden heat of passion or sudden affray and without previous malice.

5. Homicide—Evidence—Degree of Offense.—One may be found guilty of willful murder even though he be only an aider and abetter, if his acts proceed from malice aforethought, and his principal who fires the shot in sudden heat of passion or sudden affray, be guilty only of manslaughter.

L. C. LITTLE, WILLIAM CUNAGIN, H. J. JOHNSON and W. T. LAFFERTY for appellant.

CHARLES H. MORRIS, Attorney General, and HENRY F. TURNER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

On August 28, 1917, the grand jury of Jackson circuit court returned an indictment accusing Andy Shepherd and Clarkie Parker of the wilful murder of Abe Sams in Jackson county, on Sunday, July 1st. The case came on for trial on the 12th day of September following. There was a severance of trial asked for and granted, and the Commonwealth elected to try Shepherd first, but upon ascertaining that Shepherd for some reason could not be tried at that term of the court, Parker was put upon trial, and the jury returned a verdict finding him guilty of willful murder and fixed his punishment at confinement in the state penitentiary for the period of his natural life.

Defendant filed motion and grounds for new trial complaining (1) that the court erred in admitting incompetent evidence offered by the Commonwealth against him, and refusing to allow the defendant to introduce competent evidence; (2) the court misinstructed the jury and failed to properly instruct the jury and did not give the whole law of the case; (3) the verdict and judgment are not sustained by the evidence. The motion for new trial was overruled.

In order to better judge of the rulings of the court upon the three questions above presented, a brief statement of the facts will be given. The defendant, Clarkie Parker, was a candidate for re-election as constable in his district, and was electioneering. The defendant Shepherd, while a stranger in that neighborhood, was riding with Parker as he canvassed the neighborhood where the homicide occurred. Parker also claims that he held a warrant for the arrest of Roscoe Farris upon a charge of affray, and was then in search of Farris, and that he had summoned Shepherd to help in making the arrest. The deceased Sams lived at the forks of the road near a schoolhouse and in a fairly thickly populated community. Sams had been at home the night before and the whole of the day up to the time of the killing. His child was sick and this had kept him up most of the night before. Parker and Shepherd, who were riding mules, passed by the Sams home apparently under the influence of liquor and holloed and sang; no one seems to know exactly what was said by the men on the mules, although some of the witnesses state that Parker called for the deceased to come out. At any rate Sams did not go out to the road. It was Sunday and a neighbor had called at the Sams home and offered Sams a drink of whiskey; Mrs. Sams was present. The travelers did not go very far past the house until they returned and called for the deceased to come out to the road, and he and his neighbor, Wise, went out to where Shepherd and Parker were on their mules. Some conversation ensued and finally Parker asked Sams to vote for him in the election, and this Sams declined to do, giving as his reason that Parker and another had upon a former occasion treated him badly; this angered Parker, who told Sams that he would not stand for any bulldozing. Parker at the time had a thirty-eight caliber pistol in his saddle pockets. Some of the witnesses state that Sams then turned to go to his house when Parker rode his mule around in front of

Sams and cut him off from his home; about this time Shepherd, who was some little distance up the hill, rode his mule rapidly down the slope in the direction of Parker and Sams, dismounted quickly behind his mule and drew a pistol; Parker dismounted about the same time on the side next to Sams. Meanwhile there were threats and curses exchanged between the parties; instantly Shepherd began to fire at Sams, one bullet taking effect in the leg of Sams and the other in his abdomen. He then turned quickly on an old man named Wise, an entirely innocent bystander, and fired at him, killing him instantly, then fired at and wounded another onlooker named John Alex Sams, inflicting only a slight injury in the left arm. Before any one could realize what had happened both Shepherd and Parker ran away leaving their mules as well as the dead and dying. There is no evidence that Parker fired a shot or that he exhibited a pistol. The evidence further shows that the deceased Sams was unarmed except he had in his pocket an ordinary pocket knife; the old man Wise, who was killed instantly by Shepherd, was wholly unarmed and, according to the evidence, threw up his hands and indicated that he was an unarmed noncombatant; Mrs. Sams was standing near her husband at the time of the shooting, but at the sight of the pistol she turned her head to keep from seeing the killing.

The witness, John Alex Sams, testified as follows: " 'Well,' he said, 'by God you was always counted a bad man, and that is the sort of fellow I want to meet up with,' and my brother says, 'I don't claim to be a bad man, I am your friend, I want to be with everybody,' and Clarkie says—I didn't understand all he did say, he was talking so fast—but my brother says 'You are out electioneering, you go on and get all the votes you can,' and he allowed he would go on when he got God-damned good and ready, and my brother says 'I will go back to the house to my sick baby, I will go back to it,' and about that time I took hold of my brother's arm, and says 'Let's go to the house.' Just as we turned around, Clarkie wheeled his mule in between us and the house, and says something, I don't remember what was the word he says though then, and my brother says 'You want me to vote for you,' and my brother, pointed at me and Uncle Charley Wise, 'you want everybody to vote for you; this is no way for a man to act like,' and he just repeated he would go on when he got God-damned good and ready, and my brother—this man Shepherd, about that time he

come back down—he was about 45 steps up above where we was at Andy Shepherd and George Wise, and he come run something near about two-thirds of the distance towards us—about 10 or 15 steps, and pulled his pistol up to the top of his pocket, and stuck it back down, and jumped off of his mule on the upper side, then Clarkie Parker jumped off of his mule on the lower side there, and the mule was between me and my brother and him, and when Shepherd jumped off of his mule, he jerked his pistol and commenced shooting, and he began to running backwards, he shot two shots right together, about that quick (indicating), and never shot again I guess for a couple of seconds, or a little longer, then he turned back on Uncle Charlie Wise, and throwed his pistol down that way (indicating), and shot and whirled back on us again. Q. What was Charley Wise doing at the time he shot him? A. All that I seen of, Uncle Charley Wise started to throw his hands up this way (indicating), about that high (indicating), had nothing at all in his hands. Q. What did your brother have in his hands? A. Nothing at all. Q. Did he have any weapons of any kind? A. No sir. Q. Pistol or knives? A. No, sir. Q. Did you have any knife or pistol? A. No, sir, none at all, until after he had shot uncle Charley Wise, shot him and then while he come, I then made for my knife, and the pistol fired all about the same time. He shot me in the left arm. Q. Had Abe Sams, yourself, or Charley Wise, made any demonstrations to draw any weapons, or to do either Andy Shepherd or Clarkie Parker any violence, at the time he done this shooting? A. None at all. Q. What was Clarkie Parker's condition as to whether he was drunk or sober? A. He was drunk.''

In a few minutes after the shooting two neighbors came to the assistance of Sams who had fallen mortally wounded, and who was yet lying in the road under the shade of a tree. He was suffering great agony, and upon their approaching him he said, ''I am killed; my bowels is shot all to pieces.'' This was about one o'clock in the afternoon. After this statement Sams told the two witnesses briefly how he came to be shot, and after being carried into the house Sams again repeated the story to these witnesses and others. Sams died about dark that night. Upon the trial the statement of the deceased was allowed to be detailed to the jury as the dying declaration of Sams, and of this the defendant, Parker, complains because, as he asserts, even at that time and after this state-

ment was made the deceased inquired if the doctor had not had time to arrive, showing, as it is claimed, that Sams entertained hope, even though slight, of recovery.

The witness Baker in telling what took place when he first went up to the wounded man, said:

"Well, when I walked up to him, I spoke to him, and he knowed me, and I said, 'Are you hurt, Abe,' and he says 'Yes, I am killed; my bowels is shot all to pieces.' Then he went ahead and told how the racket come up. He said, 'Parker and this fellow—they said his name was Shepherd'—that is the way he said it—passed there and called him, and he said he never went out, and said they went on down and up above the school house, and back up there and then back up above the house, and said they called him. He said he went up there to where they was at, and said Clarkie asked him to vote for him, said he remarked to him that he wouldn't vote for him, the way him and Andy Baker had treated him—as I told you while ago—said Clarkie remarked to him he didn't have to take none of his God-damned bulldozing and said he just started—said Clarkie was on his mule, and he started to turn around to tell Shepherd to take Clarkie off, and said about that time he turned to tell Shepherd to take Clarkie off, said about that time he turned and Shepherd commenced pouring the lead into him. Q. Is that all he said about it? A. That is about all he said to me about it."

The above statements of the witness contain what is termed in this record the "dying declaration." On cross-examination the witness was asked: "Q. Did he (Sams) make any inquiry there as to whether the doctor had come? A. He asked me if the doctor had come. I said 'No, he had not;' he said, 'If he don't come pretty quick, I can't stand it in this shape.'"

It is further shown that the wounded man uttered oaths and said in substance that if he lived he would get even with Shepherd and Parker. All this time Sams was in great agony and frequently was unable to speak for a few moments. Once or twice he had to wait to catch his breath before going on with his statement.

As presented we do not think this statement of the wounded man is competent as a dying declaration under the rule recognized in this state. In order to render the statement made by an injured person competent as his dying declaration it must appear that the party was at the point of death, and shortly thereafter died; that the statement was made when every hope of this world was

gone; when every motive of falsehood was silenced, and
the mind was induced by the most powerful considerations
to speak the truth.     Several times this court has writ-
ten that "a situation so solemn, and so awful, is consid-
ered by the law as creating an obligation equal to that
which is imposed by a positive oath in a court of justice."
(Tibbs v. Commonwealth, 138 Ky. 558; Commonwealth
v. Johnson, 158 Ky. 579.)   From the evidence quoted we
are not convinced that the deceased Sams had wholly re-
linquished hope of recovery at the time of the making of
the statement introduced in evidence, and this being true
the trial court should not have allowed the introduction
of the statement as a dying declaration.   However, we
do not regard this as prejudicial error under the facts of
this case because several eye-witnesses testify to facts in
substance the same as those detailed by the deceased, ex-
cept that the statement of Sams was much more brief.
Every point contained in the statement material to the
case of the Commonwealth was fully covered by testimony
of other witnesses who were competent to testify.   The
alleged dying declaration does not differ in any material
respect from the evidence given by the eye-witnesses.

It is insisted that instruction number one is faulty in
the last four clauses thereof, each of which begin with the
word "guilty" because, as it is alleged, these four clauses
assume aiding, abetting, assisting, counseling, inciting,
encouraging or commanding on the part of the appellant.
In the first paragraph in this instruction the jury is told
that if they believe from the evidence beyond a reason-
able doubt that the defendant, Andy Shepherd, in Jack-
son county, Kentucky, and before the finding of the in-
dictment herein, willfully and feloniously shot and killed
the deceased, Abe Sams, not in his necessary or reason-
ably apparent necessary defense, and not in the necessary
or reasonably apparent necessary defense of the defen-
dant, Clarkie Parker; and shall further believe from
the evidence beyond a reasonable doubt that the defen-
dant, Clarkie Parker, was present at the time and near
enough so to do and did willfully and feloniously aid,
abet, advise, assist, counsel, incite, encourage, or com-
mand the said Shepherd to so shoot and kill the said Abe
Sams not in his necessary or reasonably apparent neces-
sary defense or the necessary or reasonably apparent
defense of the defendant Andy Shepherd, then you
will find the defendant, Clarkie Parker, guilty of murder
if the aiding and abetting were done with malice afore-

thought; guilty of manslaughter if the aiding and abet-
ting was done in sudden heat and passion or sudden af-
fray. One of the specific complaints is that the second
paragraph of the same instruction tells the jury to find
Parker guilty of willful murder if it believe from the evi-
dence beyond a reasonable doubt that said shooting and
killing and said aiding and abetting was done with malice
aforethought, and each of the other three paragraphs of
instruction number one are connected with the first para-
graph as above stated, so that each paragraph is made
to depend upon and is directly connected with the instruc-
tion directing the jury to find him guilty only in case
Parker willfully and feloniously aided and abetted the
killing.

The point is further made that the third paragraph
of instruction number one directs the jury to find the de-
fendant Parker guilty of willful murder if the jury be-
lieve from the evidence beyond a reasonable doubt that
the shooting by Shepherd was done in sudden heat of
passion or sudden affray, and that the aiding and abet-
ting by Parker was done with malice aforethought. To
thoroughly understand this instruction one must be ac-
quainted with the evidence introduced upon the trial. It
will be remembered that Parker and another man named
Baker had some time before the killing imposed upon and
abused the deceased Sams, and that there was bad feeling
existing between Parker and Sams. The Commonwealth
asserts that this was on Parker's mind at the time he
passed the house the first time on the day of the killing
and caused him to return, and that all this is fully proven
by his acts, conduct and manner described by the wit-
nesses in the evidence. While Shepherd may not have en-
tertained malice against the deceased Sams, the evidence
sufficiently sustains the conclusion reached by the jury that
Parker did entertain such feeling towards Sams, and with
this feeling in his breast, after passing the house of the
deceased, induced this desperate man Shepherd to return
to the house of the deceased for the purpose, as the jury
no doubt concluded from the evidence, of precipitating a
difficulty and thus giving Shepherd an opportunity, under
the excitement of the moment, to shoot and kill the de-
ceased Sams. Under such facts the shooting and killing
by Shepherd may have been in sudden heat of passion
so far as Shepherd was concerned, but the aiding, abet-
ting, encouraging, inciting, and commanding on the part

of Parker was with malice aforethought; and Parker under such facts is guilty of willful murder. This court has several times recognized the principle that where the person who fires the shot which produces the death, acts in sudden heat of passion or sudden affray, and is guilty only of manslaughter, the aider and abetter who incites the killing may be guilty of willful murder if at the time he aids, abets and incites the killing, he entertains malice aforethought, and his actions are controlled by such malice. Mickey v. Commonwealth, 9th Bush 596; Dorsey v. Commonwealth, 17 S. W. 183; Arnold v. Commonwealth, 55 S. W. 894. The rule is stated as follows: If several persons are present at the death of a man, they may be guilty of different degrees of homicide, as one of murder and another of manslaughter; for if there be no malice in the party striking, and malice in the abetter, it will be murder in the latter though only manslaughter in the former. (1st East P. C., chapter 5, sec. 121, page 121.) So, likewise, it may be murder in the party striking the fatal blow and only manslaughter on the part of the abetter. (1st Hale, 446; Russell on Crimes, 510; Roberson's Kentucky Criminal Law, vol. 1, page 93.)

But for Parker's feeling towards the deceased Sams, his returning with his companion Shepherd to the home of Sams, and calling Sams out to the road and afterwards provoking an assault and precipitating the difficulty, Shepherd would not have fired the fatal shot. Whether Shepherd and Parker, while passing the house the first time or afterwards on their journey, discussed a plan of involving the deceased Sams in a row and taking his life, or whether Parker alone entertained these ideas and planned it himself, is not material so far as this case is concerned. In a case of this kind both are principals and they are so charged. But while the one who fires the shot may be guilty only of manslaughter, the abetter and aider in whose heart was the malice and who by his contrivance brought on the sudden heat of passion in the gunman which resulted in the death of the man against whom the abetter harbored malice and intended to wreak vengeance, the abetter is guilty of willful murder if his aiding and abetting was done wtih malice aforethought. Viewed in this light the instruction complained of properly submitted the question to the jury.

The only other point made by appellant is that the evidence does not sufficiently support the verdict. We

can not agree with this contention for many serious reasons. The issues of fact were properly submitted to the jury and found against Parker. To the court this appears to have been an absolutely inexcusable murder. In attempting to justify the killing Parker claims that the deceased, Sams, had a knife, but the jury did not believe this, no doubt regarding it as the same subterfuge often resorted to in emergency to sustain a plea of self-defense. How often the false plea of reaching for or attempting to get a weapon from a pocket has been relied upon to deceive and mislead juries, the most expert criminologists can not determine. Even if Sams did have a knife it is doubtful whether Parker and Shepherd could justify this shooting because they undoubtedly came to his house with the malicious purpose of precipitating the difficulty without the slightest excuse, and had not in good faith abandoned it before the killing. It is not necessary in order for one to be proven guilty of willful murder that the witness should detail words or statements showing that the defendant conspired to bring on the killing, or that he fired the fatal shot, provided he was present and his acts and conduct in connection with the person who actually struck the blow or fired the shot which produced the death was such as to convince reasonable men to the exclusion of a reasonable doubt that he was aiding and abetting the principal in the commission of the crime. The fact that Parker did not exhibit a weapon, or fire a shot, or strike a blow, does not militate against the position of the Commonwealth in this case because he, as between himself and Shepherd, was the one in whose breast rancored the malice and he it was who brought Shepherd to the scene of the homicide and precipitated the difficulty. We think the evidence fully sustains the verdict, and the judgment is therefore affirmed.