No. 16,083.

REIGAN ET AL. *v.* THE PEOPLE.
(210 P. [2d] 991)

Decided October 3, 1949. Rehearing denied October 24, 1949.

Mr. Frank Delaney, Mr. Robert Delaney, for plaintiffs in error.

Mr. Allyn Cole, for the people.

*En Banc.*

Mr. Justice Moore delivered the opinion of the court.

Plaintiffs in error were named defendants in an information filed before a justice of the peace in which it was charged that they did "unlawfully conspire together and co-operate to commit a crime and misdemeanor, to-wit: the crime and misdemeanor of unlawfully trapping and killing beaver, and the unlawful possession of the hides of beaver, and to become accessories before the fact of such crimes, contrary to the form of the statute. * * *"

Trial before the justice of the peace resulted in conviction. Upon appeal to the county court of Garfield county defendants were again convicted and they here seek review of the judgment there entered assessing fines of $300.00 and costs against each defendant. The

parties are hereinafter designated as they appeared below.

The defendants were game wardens. They were assigned by officials of the Game and Fish Department to make investigations in connection with a law enforcement drive intended to suppress the illegal taking and transporting of beaver pelts in northwestern Colorado.

The theory of the prosecution was that the defendants cooperated together to induce two boys, not then so engaged, to go into the business of unlawfully trapping beaver and selling the hides to defendants. Briefly summarized, the evidence of the people tended to prove that Jack Kissee, Billy Weatherly and Melvin Roberts were living upon a ranch on Divide Creek; that defendants came to this ranch at about 4:30 P.M. on November 12, 1946, introduced themselves as Shannon and Owens and at first posed as persons interested in livestock. Billy Weatherly and Melvin Roberts, 19 and 18 years of age, were busy taking care of muskrat hides. After an hour spent in general conversation the defendant Reigan asked the two boys why they didn't catch something that had some money in it, and said that there were lots of beaver on the creek and that defendants would pay as much as $30.00 each for these hides. They then represented themselves to be fur buyers and explained that they had a system of getting the "hot" beaver hides into New Mexico where they could dispose of them profitably. The automobile used by defendants displayed New Mexico license plates.

Defendants remained on the premises from about 4:30 P.M. until about 10:30 P.M., and one Kissee prepared a meal and served it. Defendants produced a bottle of whiskey and everyone drank from it. The main topic of conversation was about beaver hides, after defendants brought up the subject. Some beaver hides belonging to the Game and Fish Department were shown the Weatherly boy and one of the defendants stated that he bought these hides somewhere in Utah. Defendants

asked the boys if they knew how to take care of beaver hides, and when they stated they did not, defendants told the boys how to take care of them, "how to skin them and stretch them out." The defendants wanted to know how soon they could get some hides and the boys replied that, due to the fact that it had already frozen up in the beaver country they probably couldn't trap any. Thereupon defendants asked, "Could you catch some in the spring?" The boys said that they could and defendants said that they would come from New Mexico for forty beaver hides any time.

The witness Kissee testified that when defendants left the premises one of them said, "Well, boys, we will see you in the spring. We would like to have you have some hides and we can do business." Defendants reported the events above related to their superiors, and on the following morning met the two boys near the ranch where further conversations were had. Billy Weatherly testified that defendants then stated that they were going to leave the country and could not return that fall, but if the boys could have some hides in the spring defendants would write and tell them when they would come and get them. Defendants testified that the boys were instructed to take no action in trapping beaver until they heard from defendant Reigan, however this testimony was denied by the Weatherly boy who stated that he was sure that no such direction was given.

The record discloses that the specific instructions given to the defendants relating to the Divide Creek investigation were, "To proceed to the Divide Creek area and make contact in the Divide Creek area, particularly with whom they believed might be able to give them the whereabouts of one J. B. Weatherly and his activities, and the dates and time in the Divide Creek section." The said J. B. (Boss) Weatherly was an uncle of the Weatherly boy and the brother of Guy Weatherly upon whose ranch the "investigation" took place. J. B. Weath-

erly had some difficulty involving the illegal possession of beaver hides in 1936, and was under suspicion by officers of the Game and Fish Department. The defendant Reigan testified concerning the instructions under which he was operating: "We were to look up Boss Weatherly if we could find him." "Q. And any other?" "A. And talk to Mr. Kissee and the attendant at the Guy Weatherly ranch." Defendant Kimsey stated that the instructions given the defendants were: "That we were to go there and try to get all the information as to the whereabouts and activities of Boss Weatherly."

At the close of the people's case, and again at the conclusion of the evidence, defendants moved for a directed verdict, which motions were denied. A motion to quash the information as being insufficient to charge any offense was denied. Error is assigned upon the denial of these motions and upon the refusal of the trial court to give instructions tendered by the defendants, and in giving instructions to which objection was made, and to the admission and rejection of evidence.

Questions to be Determined. .

First: *Where officers of the law cooperate to induce another to commit a criminal act which would not have been conceived by said person except for the instigation or inducement of the officers, can the officers who cooperated to induce the act be lawfully convicted of conspiracy to cause a violation of the law?*

This question must be answered in the affirmative. The argument advanced by defendants is that, since the ultimate purpose of defendants was to arrest and bring to justice those who violated the law, there could be "no unity of intent between these defendants and the other conspirators." It is further argued that "one who participates in a crime as a feigned accomplice, in order to entrap another, or for the purpose of detecting crime, does not thereby become criminally liable." The foregoing statement is based upon a misconception and misuse of the terms "entrapment" and "detection," as ap-

plied to the activities of law enforcement officers. Defendants treat these terms as being synonymous, however there is a great difference in their meaning and that distinction is the answer to the question under discussion. While there is some confusion in the authorities in the use of these terms, when considered in the light of the facts in each case the rule of law is clear. A suspected person may be tested by being offered opportunity to transgress the law in such manner as is usual in the activity alleged to be unlawful. However, law enforcement officers may not induce persons, who would not otherwise have committed crime, to violate the law. The former is legitimate "detection" of crime, and is often necessary to efficient law enforcement. The latter is "entrapment" to commit crime in which the officer's conduct instigates the offense, the commission of which was nonexistent in the mind of the intended victim of the "entrapment."

This court has recognized this distinction in the case of *Connor v. People,* 18 Colo. 373, 33 Pac. 159, from which we quote: "We do not wish to be understood as intimating that the services of a detective cannot be legitimately employed in the discovery of the perpetrators of a crime that has been or is being committed, but we do say that when in their zeal, or under a mistaken sense of duty, detectives suggest the commission of a crime and instigate others to take part in its commission in order to arrest them while in the act, although the purpose may be to capture old offenders, their conduct is not only reprehensible, but criminal, and ought to be rebuked rather than encouraged by the courts."

The distinction between legitimate "detection" of crime and unlawful "entrapment" to a commission of crime was pointed out in *Wilson v. People,* 103 Colo. 441, 87 P. (2d) 5, where, in distinguishing that case from *Connor v. People, supra,* we stated: "In that case we sustained the defense of entrapment and reversed the

judgment of conviction. In the instant case we have the defense of detection and not entrapment and any language relating to the defense of Connor is not applicable here."

Applying these principles to the case at bar, if the cooperation of the defendants amounted to no more than an effort to "detect" a violation of law on the part of the two boys then the defendants could not be convicted of a conspiracy. If, however, the conduct of the defendants amounted to an attempted "entrapment" of the boys the judgment must stand. Whether there is here present an attempt at crime "detection" or "entrapment" is a question of fact. There was competent evidence to support either finding. Under proper instructions concerning the law the jury found an "entrapment" and it is not our province to determine to the contrary.

The authorities, upon which counsel for defendants rely, deal with "entrapment" as a defense interposed by one charged with the commission of a crime, and not with a prosecution against those who conspired or cooperated to entrap persons in the commission of an offense originating in the mind of the officers. *Wilson v. People, supra,* chiefly relied upon by defendants, involved a charge of burglary. The defendant Wilson was the detective. Had Wilson been the instigator of the offense a different result might have obtained. This court said in disposing of that case: "Wilson did not first propose the burglarizing, the idea originating with Pierce, and after the latter had told Wilson that he had burglarized the Wheat Growers Cafe several days before." Thus the facts in the Wilson case were the reverse of those existing in the case at bar. Equally inapplicable are the other authorities relied upon by defendants in support of their contention that the evidence is insufficient to support the judgment.

■ Second: *Did the trial court err in refusing instructions tendered by the defendants or in giving instructions over objections of defendants?*

This question is answered in the negative. Tendered Instruction No. 22 included the statement that "if the defendants in this case agreed to cooperate to entrap any persons suspected of violating the game law as distinguished from inducing said persons to violate the law, then you should find the defendants not guilty." It was not error to refuse this instruction. The tendered instruction uses the word "entrap" in the wrong sense. The court by instructions 7 and 10 more accurately covered the defendants' theory of defense and afforded full protection to the defendants.

 Tendered Instruction No. 25 included the erroneous statement that before a verdict of guilty could be reached the jury must believe beyond a reasonable doubt that the defendants conspired together to "cause someone to unlawfully violate the law not for the mere purpose of entrapment or apprehension of the offenders, but to further the private ends of the defendants for gain or for some other improper purpose." No error was committed in refusing this instruction. "To render a person criminally liable as a conspirator it is not necessary that under the scheme he should have had any pecuniary benefit in the matter or have joined with the view of obtaining pecuniary benefit." 12 C.J.S., p. 579, §92, 15 C.J.S., §78.

 Defendants' tendered Instruction No. 28, related to evidence of the good reputation of defendant Kimsey. No instruction was given on reputation, and the question is whether such nondirection amounts to prejudicial error. In denying the motions for new trial the trial court said: "Inadvertently this instruction was not given * * * the question was argued to the Jury by both sides as if the instruction had been given." The offered instruction, which is in proper form, has the effect of limiting the weight to be given evidence of good reputation. Where, as here, there is no instruction on that point the jurors may consider the evidence for whatever purpose

they desire in determining the guilt of defendant Kimsey.

In *Solander v. People,* 2 Colo. 48, we stated under similar circumstances: "The instruction asked as to the weight to be given to circumstantial evidence was correct in form and principle, and might have been given with propriety. But as it relates simply to the weight of evidence, and the jury were correctly advised as to the doctrine of reasonable doubt, the refusal of this instruction cannot be ground for new trial." See, also, *Smaldone et al. v. People,* 103 Colo. 498, 88 P. (2d) 103. We cannot believe, under the circumstances here present, that the failure to give the instruction on reputation prejudiced the defendant Kimsey.

We have carefully considered the objections made to the instructions given by the trial court and find no reversible error. The information was sufficient in form to charge defendants with the crime of conspiracy, and no error was committed in denying the motion to quash the information, nor do we find reversible error in the rulings of the trial court upon the admissibility of evidence.

The judgment is affirmed.

MR. JUSTICE HOLLAND not participating.