**Douglas B. VADEN, Petitioner,**

v.

**STATE of Alaska, Respondent.**

**Floyd SALTZ, Jr., Petitioner,**

v.

**STATE of Alaska, Respondent.**

Nos. S–2443, S–2500.

Supreme Court of Alaska.

Feb. 10, 1989.

Rehearing Denied March 16, 1989.

Daniel W. Allen, Anchorage, for petitioner Douglas B. Vaden.

Walter Share, Anchorage, for petitioner Floyd Saltz, Jr.

Robert D. Bacon, Asst. Atty. Gen., Anchorage, Grace Berg Schaible, Atty. Gen., Juneau, for respondent.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

COMPTON, Justice.

This petition arises out of convictions of two hunting guides, Douglas Vaden and Floyd Saltz, Jr., following undercover operations by the State of Alaska. The primary issue we address is whether allegedly illegal conduct by the undercover agents warrants reversal of the convictions. The court of appeals, in a plurality decision with one judge dissenting, affirmed Vaden's conviction. *Vaden v. State*, 742 P.2d 784 (Alaska App.1987). It also affirmed Saltz's conviction. *Saltz v. State*, MO & J No. 1510 (Alaska App.1987). We granted hearing pursuant to Appellate Rule 304.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *VADEN*

In November 1983, a horse wrangler employed by Douglas B. Vaden during the fall 1983 hunting season informed Fish and Wildlife Protection officers of illegal hunting methods allegedly used by Vaden while guiding a foreign hunter. In the spring of 1984, John Snell, an undercover agent for the Alaska Department of Fish & Game [1] posing as a hunter, contracted for guiding services from Vaden. Snell was instructed on how to conduct himself on the hunt. [2]

During the hunt Snell shot and killed four foxes from Vaden's aircraft. The season on foxes was closed at that time. Vaden provided Snell with the shotgun used to shoot the foxes, and maneuvered the aircraft so Snell could shoot the foxes. The fox carcasses were then transported to Anchorage by Vaden.

Vaden was convicted, as an accomplice, [3] on four counts of taking foxes from an aircraft (5 AAC 81.072(4) now 5 AAC 92.-080(5)) and four counts of taking foxes during closed season (5 AAC 81.330(4) now 5 AAC 88.160(2)). [4] He was also convicted in his own right on three counts of possession and transportation of illegally taken game (5 AAC 81.140(c) now 5 AAC 92.-140(c)). He was acquitted on several other counts, including solicitation of the agent's takings.

Vaden appealed his convictions, contending that no illegal acts were committed by Snell and thus no criminal liability could

---

1. Snell was "on loan" from the Wyoming Attorney General's Office, and had apparently carried out similar fish and game "sting" operations for the State of Wyoming.

2. INSTRUCTIONS TO HUNTERS:
 1. During your scheduled guide hunt you are considered an agent of the State, this however, does not permit you to take game contrary to State statutes or regulations.
 2. Your assignment during all phases of your guided hunt is to observe, record and determine the method of operation used by the guide in providing his guide service to a client.
 3. You are to follow all instructions provided to you by your guide.
 4. You are not to take any game without first being instructed to do so by your guide.
 5. Do not at any time or under any circumstances induce a guide to commit any crime.
 6. All game taken on your hunt is the property of the State.

3. AS 11.16.110 provides:
 A person is legally accountable for the conduct of another constituting an offense if
 . . . .
 (2) with intent to promote or facilitate the commission of the offense, the person
 . . . .
 (B) aids or abets the other in planning or committing the offense; or (3) acting with the culpable mental state that is sufficient for the commission of the offense, the person causes an innocent person or a person who lacks criminal responsibility to engage in the proscribed conduct.

4. Vaden was also charged with additional offenses under the "guide aiding" statute, AS 08.-54.210. These charges were later dismissed as a result of Vaden's motion to dismiss "duplicitous/multiplicitous" counts.

attach to Vaden for "aiding and abetting" or transportation of illegally taken game, and alternatively, if crimes had been committed by Snell, such law enforcement tactics amounted to entrapment as a matter of law and violated due process.[5] *Vaden v. State,* at 785–86. The court of appeals upheld Vaden's convictions. *Id.*

The court of appeals concluded that Snell had "committed the offense" of taking foxes from the air out of season, but that Snell had a personal defense of justification, which Vaden would not be able to avail himself of under AS 11.16.120.[6] 742 P.2d at 786. The court further concluded that "convicting Vaden as an accessory, when the principal was an agent for the government, is a cause for concern." However, "any government overreaching is adequately covered by the defense of entrapment," which relieves a defendant of liability where police conduct has induced a defendant to commit an offense by such persuasion or inducement as would be effective to persuade an average person to commit the offense. *Id.* at 787; *see also* AS 11.81.450. The court concluded that since Vaden had failed to show such inducement, his convictions should be affirmed. *Id.*

Judge Singleton, in a concurring opinion, agreed that Snell's actions were without proper legal authorization and were, therefore, illegal. 742 P.2d at 788.[7] He took exception, however, to the court's suggestion that the entrapment defense alone was adequate to protect against government overreaching. Judge Singleton concluded that unconscionable police conduct not involving inducement might, by itself, justify

the dismissal of a charge, but only where the police conduct "shock[ed] the universal sense of justice and violat[ed] the concept of fundamental fairness." *Id.* at 789 (quoting *Anchorage v. Flanagan,* 649 P.2d 957, 963 (Alaska App.1982)). He concluded that no such shocking police conduct was present and that the convictions should be affirmed. *Id.*

Chief Judge Bryner dissented, observing that "[t]he state's effort to ferret out crime consisted of Snell's shooting foxes as a means of convicting Vaden vicariously for the shooting of those very same foxes." *Id.* at 789. Such conduct, Judge Bryner asserted, "[falls] below an acceptable standard for the fair and honorable administration of justice" and thus justified dismissal of the charges against Vaden. *Id.* (quoting *Pascu v. State,* 577 P.2d 1064, 1067 (Alaska 1978)).

We granted Vaden's petition for hearing.

### B. *SALTZ*

In October 1984, undercover agent Thomas Pagel,[8] posing as a client, accompanied licensed assistant guide Floyd Saltz into the bush.

Initially Pagel had contracted for a fishing trip. Pagel apparently expressed a desire to hunt on the trip also and questioned Saltz about hunting. Pagel testified that Saltz responded by saying "you could not kill a caribou the same day you were airborne but that once you got in the bush you did basically what the hell you wanted to."

---

5. Vaden preserved these defenses by a timely pretrial motion to dismiss, which was denied.

6. AS 11.16.120 provides in part:
 (a) In a prosecution for an offense in which legal accountability is based on the conduct of another person;
 . . . .
 (2) it is not a defense that
 (A) the other person has not been prosecuted for or convicted of an offense based upon the conduct in question or has been convicted of a different offense or degree of offense;
 (B) the offense, as defined, can be committed only by a particular class of persons to

which the defendant does not belong, and the defendant is for that reason legally incapable of committing the offense in an individual capacity;
 or
 (C) the other person is not guilty of the offense.

7. He expressed "grave reservations," however, as to whether Snell's acts would fall within the "justification" exception to criminal liability. 742 P.2d at 788.

8. Pagel was apparently on contract from the State of Wyoming.

On October 6 the pair flew out to Talarik Creek. Pagel testified that Saltz told him the area was limited to flyfishing only and gave him a fly rod. A short time later Saltz decided the fishing was slow and gave Pagel a baited spinning rod. The pair then caught about thirty trout on spinning gear.

Pagel also testified that after the trout stopped biting the pair began catching Northern Pike. According to Pagel, Saltz caught 20 to 30 pike, killed them and threw them into the lake.

On October 7 Saltz flew Pagel into an area with little air traffic for a caribou hunt. Saltz handed Pagel a rifle and pointed out which bull caribou to shoot. Pagel shot and killed the bull. Saltz also pointed out a cow caribou for Pagel to shoot. However, Pagel gave Saltz the rifle and Saltz shot the cow. They did not salvage the meat from the cow. Saltz allegedly shot at another bull, but it is not clear whether it was killed.

After the two took pictures of the bull Pagel shot, they started to skin it. While working on the hindquarters, Saltz told Pagel the meat was not worth salvaging because the caribou "smelled as if it was in rut." Pagel indicated he wanted the antlers and Saltz salvaged them. The pair left the meat.

Saltz testified to a different version of facts. He claimed Pagel initiated the fishing violations. He also claimed Pagel was left alone and shot the caribou while Saltz was not present, and that it was Pagel's idea to leave the meat behind.

The offenses with which Saltz was charged grew out of three basic incidents: (1) Pagel's killing and wasting of a bull caribou the same day he was airborne, (2) Saltz's killing and wasting of a cow caribou the same day he was airborne, and (3) both parties' use of illegal fishing gear and waste of fish.

Saltz's pretrial motions to dismiss were denied by the trial court. At trial, the jury believed Pagel's version and convicted Saltz on all 16 counts alleged against him, including soliciting the violations.[9]

Saltz appealed, arguing *inter alia* that his convictions must be reversed because of Pagel's illegal acts. The court, citing its earlier decision in *Vaden v. State*, rejected Saltz's argument. The court did conclude, however, that there were "three groups of three counts in which the same conduct forms the basis for all three counts: one based on aiding by a guide, another based on aiding and abetting and the other based on solicitation." The court concluded that conviction on all three counts violated double jeopardy principles, and thus ordered the trial court to vacate two of the three counts in each group. Chief Judge Bryner, separately concurring, would have also stricken those convictions "predicated on Pagel's illegal acts;" however, he concurred in the result since each of the convictions had been accompanied by "parallel convictions for solicitation based on Saltz's own conduct."

We granted Saltz's petition for hearing, but limited our review to those issues already before us in *Vaden*.

## II. DISCUSSION

### A. LEGALITY OF THE UNDERCOVER AGENT'S ACTIVITIES.

Initially Vaden challenged his "aiding and abetting" and transportation convic-

---

**9.** Specifically, the counts were:

Count I: Soliciting taking bull caribou same-day airborne
Count II: Soliciting taking cow caribou same-day airborne
Count III: Soliciting waste of bull caribou
Count IV: Aid taking bull caribou same-day airborne
Count V: Taking cow caribou same-day airborne
Count VI: Attempt take bull caribou same-day airborne

Count VII: Aid waste bull caribou
Count VIII: Wasting cow caribou
Count IX: Guide aiding taking bull caribou same-day airborne
Count X: Guide aiding waste of bull caribou
Count XI: Transportation of illegally-taken game
Count XII: Solicit fishing with illegal gear
Count XIII: Using illegal fishing gear
Count XIV: Aid use of illegal fishing gear
Count XV: Waste of fish
Count XVI: Guide aiding illegal fishing.

tions on the ground that the undercover agent's actions were legal. Saltz challenged his guide "aiding and abetting" and transportation convictions on the same grounds. They argue that for these convictions to be sustained, someone must have committed an illegal act. *See United States v. Sanford*, 547 F.2d 1085 (9th Cir. 1976). (To sustain convictions under Lacey Act interstate transportation of illegally killed game, undercover agent's actions must be illegal). We agree with the court of appeals that the agents committed the offenses. *See* 742 P.2d at 786. However, it is irrelevant whether the agents' acts were authorized. As explained below, if the agents had a justification defense it was personal to them.

### B. APPLICABILITY OF JUSTIFICATION DEFENSES TO ACCOMPLICES' LIABILITY.

■ Both Vaden and Saltz argue that they could avail themselves of the public authority justification defense available to Snell and Pagel. It is not necessary to decide whether an undercover agent in these circumstances may utilize a public authority justification defense. *See* AS 11.-81.420.[10] As the court of appeals concluded, a justification defense is personal to the undercover agent and not transferable to the accomplice. 742 P.2d at 786. It is clear from our statutory scheme that a principal does not need to be found guilty or even prosecuted in order to convict the accomplice.[11] Further, it has been said that "it is the abettor's state of mind rather than the state of mind of the perpetrator which determines the abettor's guilt or innocence." R. Perkins & R. Boyce, *Criminal Law* 743 (3d ed.1982) (hereinafter

*Criminal Law* ). Because the accomplice's state of mind is the focus, defenses of entrapment, duress and heat of passion are not imputed to the accomplice. *United States v. Azadian*, 436 F.2d 81 (9th Cir. 1971) (entrapment); *State v. Harvey*, 303 Or. 351, 736 P.2d 191, 193 (1987) (per curiam) (duress); *Parker v. Commonwealth*, 180 Ky. 102, 201 S.W. 475, 478 (1918) (heat of passion).

The entrapment defense has been likened to an immunity from prosecution based on government conduct. *Azadian* at 82–83 (quoting *Carbajal–Portillo v. United States*, 396 F.2d 944, 948 (9th Cir.1968)). The public authority justification defense operates to immunize the public official from criminal liability for acts within the scope of the officials' authority. *See, Criminal Law, supra.* at 1093. Because entrapment and the public authority justification defense are similar in this regard, even if the public authority defense were available to the undercover agents, neither Vaden nor Saltz could avail himself of the agent's defense.

### C. THE ACTIONS OF SNELL AND PAGEL DO NOT CONSTITUTE ENTRAPMENT.

Vaden raised the defense of entrapment before the trial court. The trial judge rejected the defense after a pretrial hearing. The court of appeals upheld the trial judge's determination. 742 P.2d at 787. Vaden did not pursue the entrapment issue in this court.

Saltz also raised an entrapment defense in the trial court. The trial judge similarly rejected the defense. Saltz appealed the

---

**10.** The public authority justification defense is codified as AS 11.81.420 which reads:

 (a) Unless inconsistent with AS 11.81.320—11.81.410, conduct which would otherwise constitute an offense is justified when it is required or authorized by law or by a judicial decree, judgment, or order.

 (b) The justification afforded by this section also applies when

 (1) the person reasonably believes the conduct to be required or authorized by a decree, judgment, or order of a court of competent jurisdiction or in the lawful execution of legal

process, notwithstanding lack of jurisdiction of the court or defect in the legal process; or

 (2) the person reasonably believes the conduct to be required or authorized to assist a peace officer in the performance of the officer's duties, notwithstanding that the officer exceeded the officer's authority.

 As noted by Judge Singleton, this defense may or may not be available to an undercover agent in the position of Snell or Pagel. 742 P.2d at 788.

**11.** *See supra* note 6.

issue to the court of appeals, which upheld the trial court. *Saltz v. State, supra.* Saltz continues to pursue this issue.

■ The availability of the entrapment defense in a particular case is a question for the trial court. *Folsom v. State,* 734 P.2d 1015, 1017 (Alaska App.1987). The defendant must show, by a preponderance of the evidence, that the police employed tactics of "persuasion or inducement such as would be effective to persuade the average person ... to commit the offense." AS 11.81.450, *Id.* Here there is no indication in the record that Pagel employed such tactics.[12] On the basis of the record, the trial judge could reasonably conclude that Saltz failed to establish entrapment by a preponderance of the evidence. 734 P.2d at 1017. Therefore, we affirm the court of appeals on this issue.

### D. THE CONDUCT OF THE UNDERCOVER AGENTS DID NOT VIOLATE DUE PROCESS.

Both Vaden and Saltz challenge their convictions on due process grounds. They rely on dictum of the United States Supreme Court in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In *Russell,* the Supreme Court indicated that at some point government involvement in detecting criminal activity could rise to a level of outrageousness "shocking to the universal sense of justice." 411 U.S. at 432, 93 S.Ct. at 1643, 36 L.Ed.2d at 373 (quoting *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 303, 41 L.Ed.2d 268, 276 (1960)). Under this approach, illegal conduct of the government is not a *per se* bar to prosecution; the test is whether the government's conduct is outrageous enough to warrant dismissal of the charges. *See Hampton v. United States,* 425 U.S. 484, 491, 96 S.Ct. 1646, 1650, 48 L.Ed.2d 113, 119 (1976) (Powell, J., concurring).

The court of appeals divided over whether the due process defense was incorporated into our entrapment defense. *Compare* 742 P.2d at 786, 787 *with* 742 P.2d at 789 (Singleton, J., concurring). Generally, police conduct that is outrageous or below the level of "an acceptable standard for the fair and honorable administration of justice" will be encompassed by the entrapment defense. *Pascu,* 577 P.2d at 1067. There may be other times when police conduct is so unacceptable that it rises to a "demonstrable level of outrageousness" that warrants dismissal. *Hampton,* 425 U.S. at 496, n. 7, 96 S.Ct. at 1653, n. 7, 48 L.Ed.2d 113, 122 n. 7 (Powell, J., concurring).

Both Vaden and Saltz cite numerous cases in which federal and state courts found government conduct to be outrageous enough to bar prosecution. The majority of these cases involve government conduct in drug sales or manufacture. They support the proposition that at some point government conduct can be outrageous enough to warrant a dismissal. *See, e.g., United States v. Twigg,* 588 F.2d 373 (3rd Cir.1978); *State v. Hohensee,* 650 S.W.2d 268 (Mo.App.1982).

*Hohensee* presents a more egregious set of facts than the instant case. Hohensee was convicted as an accomplice to a burglary. 650 S.W.2d at 269. The actual burglary was carried out by two paid informants and a police officer. Hohensee merely acted as a lookout. *Id.* at 268–269. In reversing Hohensee's conviction, the court held that sponsoring the break in was outrageous conduct on the part of the government and barred prosecution. *Id.* at 274. The court observed that Hohensee's only conduct was standing watch as lookout one-half block from the building burglarized. *Id.*

In the instant case, we conclude that the government's conduct is not outrageous enough to bar prosecution. However, we reject the implication in the opinion of the court of appeals that outrageous government conduct is subsumed within the en-

---

**12.** Indeed, at trial Saltz was convicted of soliciting the offenses committed by Pagel. *See supra* note 9.

trapment defense. It alone may justify judicial intervention.

In searching for a standard by which government conduct, or misconduct, is to be measured, we find persuasive the reasoning of the Ninth Circuit Court of Appeals in *United States v. Williams*, 791 F.2d 1383 (9th Cir.1986) *cert. denied, Sears v. United States*, 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986). There the court suggested that in general, to be outrageous enough to bar prosecution "the government must have 'engineered and directed the criminal enterprise from start to finish.'"[13] *Id.* at 1386.

■ In neither Vaden's nor Saltz's case did the government "engineer and direct the criminal enterprise from start to finish." *Williams* at 1386.

In Vaden's case, the state had information that Vaden had used illegal hunting practices the previous fall.[14] Vaden was in control of the aircraft when Snell shot the foxes. Vaden maneuvered the aircraft to provide Snell with a platform from which to shoot. Vaden also provided the shotgun used to shoot the foxes. This was not a government engineered crime from start to finish. *Id.* Nor was Vaden merely standing watch while the government agents perpetuated the crime as in *Hohensee.* Instead, Vaden was an active participant.

In Saltz's case, the jury found that he "engineered" the crimes. His convictions

demonstrate that the jury believed he provided the rifle and pointed out the bull caribou Pagel should shoot. The jury also believed that he indicated the meat was bad and suggested that they salvage only the antlers. The government did not engineer Saltz's criminal conduct from start to finish, either. The jury implicitly found he was a willing instigator of the crimes.[15]

■ We are not persuaded by Vaden and Saltz's argument that the charges in this case be dismissed solely because the government agents engaged in illegal hunting and fishing activity. In the plurality opinion in *Hampton*, the Supreme Court suggested that the correct remedy when police go outside the scope of their duties is to "prosecute the police," not "free the equally culpable defendant." *Hampton*, 425 U.S. at 490, 96 S.Ct. at 1650, 48 L.Ed.2d at 119. This remedy has been used in other states to curb offensive conduct. *See, e.g., Reigan v. People*, 120 Colo. 472, 210 P.2d 991, 120 (1949) (prosecution of game wardens for conspiracy for entrapping 18 and 19-year olds to unlawfully trap beaver).

## III. CONCLUSION

For the above reasons we AFFIRM the convictions of Vaden and Saltz.

BURKE, Justice, with whom MOORE, Justice, joins, dissenting.

I respectfully dissent.

---

**13.** The court also said that outrageous conduct barring prosecution would be found when the government's involvement was *"malum in se"*. *Williams* at 1386.

In the instant case, the government involvement was not *malum in se. "Malum in se"* is defined as follows:

A wrong in itself; an act or case involving illegality from the very nature of the transaction, upon principles of natural, moral, and public law. An act is said to be *malum in se* when it is inherently and essentially evil, that is, immoral in its nature and injurious in its consequences, without any regard to the fact of its being noticed or punished by the law of the state. Such are most or all of the offenses cognizable at common law (without the denouncement of a statute); as murder, larceny, etc.

Black's Law Dictionary 865 (5th ed. 1979) (citations omitted). Acts merely prohibited and not

rising to the level of *malum in se* are *malum prohibitum*, which is defined as follows:

A wrong prohibited; a thing which is wrong *because* prohibited; an act which is not inherently immoral, but becomes so because its commission is expressly forbidden by positive law; an act involving an illegality resulting from positive law. Contrasted with *malum in se.*

*Id.*

Because fish and game violations are not inherently evil or immoral and are proscribed only by statute, they are *malum prohibitum* and not *malum in se.*

**14.** Vaden was targeted for investation based on information supplied by an employee who allegedly had observed illegal hunting practices during fall hunts in 1983.

**15.** *See supra* note 9 (solicitation charges).

The danger to Alaska's resources posed by persons willing to assist others in the violation of state fish and game laws is both obvious and substantial. There must, however, be limits upon the degree of police involvement in criminal activity which will be tolerated. When the police or their agents commit criminal acts in order to charge others as accessories to those same acts, in my view the line is crossed.

The convictions in the cases now before us could not have been obtained had law enforcement officers not broken the law. Accordingly, the situation differs markedly from that found in the "outrageous conduct" cases cited by my colleagues. Here, the state seeks to obtain convictions *because of* the illegal conduct of its own agents, rather than *in spite of* such conduct. The state does not ask this court merely to close its eyes to the officers' illegal acts. On the contrary, it asks that we recognize such acts as an acceptable means of providing an element essential to conviction of these defendants.

Notably, the court cites no case in which an officer of the law has been permitted to commit a crime as principal, for the sole purpose of securing the conviction of another as an accomplice; nor does it cite any case in which the police have been allowed to break the law in order to imbue some object with contraband status, so that it may later be used to support a charge of illegal possession or transportation. There is, however, case law to the contrary.

In *State v. Hohensee*, 650 S.W.2d 268 (Mo.App.1982), state police retained the services of one undercover police officer, Roberts, and two known burglars, Bressie and Yarberry, who were instructed to burglarize a building. The purpose of the plan was to secure the conviction, on a theory of accomplice liability, of a fourth burglar who had agreed to stand lookout for the other three. *Id.* at 268–70. The court held that the government's involvement in the break-in was outrageous and that due process barred the conviction of the defendant for burglary. *Id.* at 274. Distinguishing the case from those in which convictions had been sustained notwithstanding some police involvement in the criminal enterprise carried out by the defendants, the court noted:

> In [those cases] the defendant himself participated in the illegal entry.... If the conduct of Bressie, Yarberry and Officer Roberts, each acting as a salaried agent of the police department, is subtracted from the ... break-in, what remains of that midnight enterprise is a lone figure, sitting in a parking lot ½ block away. It is true that defendant had criminal intent but his conduct, standing alone, represented no more of a threat to society than that of a stargazer, similarly situated, contemplating Polaris. It is difficult to conceive a situation where the government's involvement could be greater or the defendant's could be less, and the conduct of the latter still be a likely subject for prosecution.

> The break-in was accomplished by the government agents, whether or not defendant was in the vicinity. If the government agents had not been there, doing their illegal acts, defendant's conduct would not be illegal.

*Id.*

The instant case is on all fours with *Hohensee*. Here, as in that case, the criminal act which serves as the basis for both the accomplice liability and the illegal transportation charges was supplied by government agents. When such illegal conduct is subtracted from the equation, the conduct of the defendants, however evil the intent which accompanied it, does not amount to a crime. Accordingly, their convictions should be quashed as was the conviction in *Hohensee*.

The majority apparently assumes that game offenses, being *"malum prohibitum"* rather than *"malum in se,"* cannot be deemed sufficiently outrageous to trigger due process concerns. This notion, however, was implicitly rejected by the Ninth Circuit Court of Appeals in *United States v. Stenberg*, 803 F.2d 422 (9th Cir. 1986).

In *Stenberg*, United States Fish and Wildlife Service agents carried out two hunts virtually identical to those involved

in the cases at bar. The charges based upon these hunts, at least as to the outrageous conduct defense,[1] were not directly at issue on appeal. The Court of Appeals refused to dismiss the defendants' numerous other convictions for independent wildlife crimes on the basis of outrageous conduct.[2] The court reasoned that the defendants' involvement in "a continuing series of similar crimes during the government conduct at issue" precluded them from raising the defense. *Id.* at 429. The court was careful to note, however:

> But for the evidence of that additional unlawful activity we might well have reached a different result. The killing of wildlife, on more than one occasion, by an FWS agent raises significant questions as to the extent to which government agents may commit serious crimes in order to prevent others from committing similar offenses. Here, the government agent was not a passive participant or simply a purchaser or transmitter of contraband otherwise destined for the market place. To the contrary, he himself was the perpetrator of the most serious offenses involved—the actual killing of protected wildlife. Under different circumstances such active criminal behavior by a government agent might well result in our upholding a defense of outrageous government conduct.

*Id.* at 430–31 (footnote omitted).[3]

Again, the reasoning contained in the quoted portion of *Stenberg* would seem perfectly applicable in the case at bar. Indeed, the conduct by fish and game agents in this case is identical to that described in *Stenberg*. There has been no showing that the defendants in this case were "involved in a continuing series of similar crimes during the government conduct at issue"; at least none which comes close to the level of criminal activity engaged in by the defendants in *Stenberg*.[4] Accordingly, dismissal based upon the outrageous conduct defense is appropriate.

The accomplice liability charges should fail on another ground as well: the longstanding common law rule that the acts of a feigned accomplice may never be imputed to the targeted defendant for purposes of obtaining a conviction. In *State v. Neely*, 90 Mont. 199, 300 P. 561 (1931), the Montana Supreme Court applied this principle under circumstances akin to those in the case at bar. In *Neely*, a cattle owner employed a detective, Harrington, to "get in" with suspected cattle thieves during an act of cattle rustling. *Id.* 300 P. at 562. Harrington associated himself with the criminal enterprise, and the crime was carried out. *Id.* 300 P. at 562–63. Harrington himself, however, committed the principal offense of purloining the cattle, while the targeted suspect merely stood watch outside the premises and offered various other forms of assistance before and after commission of the offense. *Id.* The court reversed Neely's conviction as an accom-

---

**1.** As to one defendant, the charges relating to the hunt by fish and wildlife agents never reached the Court of Appeals. *Stenberg*, 803 F.2d at 426. As to the other defendant, the court dismissed the hunt-related charges on other grounds. *Id.* at 435–37.

**2.** The defendants were actually convicted of a number of crimes unrelated to the fish-and-wildlife-sponsored hunts. Most of these involved the sale of hides and antlers of game illegally taken by third parties. *Id.* at 426–28. In some cases the sales were made to police agents; in others they were made to persons uninvolved with the undercover operations. *Id.* at 430.

**3.** The court disavowed as "dictum" its earlier suggestion in *United States v. Sanford*, 547 F.2d 1085 (9th Cir.1976), that fish and game viola-

tions by state officials would not amount to "outrageous conduct" for purposes of the defense. *Id.* at 431.

**4.** There was absolutely no showing on the record that Vaden was engaged in "similar crimes during the government conduct at issue" here. Saltz' contemporaneous fishing and wildlife violations (e.g., personal commission of fishing and wildlife offenses) arguably qualify as sufficient to trigger the *Stenberg* rule, and I would agree that Saltz should be precluded from arguing for dismissal of these collateral offenses. As to those offenses based solely upon the agents' illegal conduct, however, i.e., accomplice liability and illegal transportation, I see no reason to preclude the challenge. The *Stenberg* court did not need to address this issue, see *supra* note 4 However, I am confident it would have held accordingly.

plice to the crime,[5] reasoning as follows: [Even] assuming that the original plan emanated from Neely, Harrington ruined the case he was building up when, on his failure to induce Neely to go to Meridian basin and drive out cattle, he himself did so without Neely's assistance.

....

The owner of property, or the state, may employ detectives or decoys to secure evidence against those engaged in, or who contemplate, a violation of the law and, if the intent originates with, and is carried out by, the person so decoyed or caught, and the detective or decoy goes with him only for the purpose of obtaining evidence, or even assists him in the commission of the crime for the purpose of capturing the criminal in the act, a conviction will be upheld *but in such a case, in order to hold the alleged offender criminally responsible, it is necessary to show that he participated in every essential act necessary to constitute the crime, whether the plan originated with him and the original intent was his, or the plan originated with the detective and the intent was by that person instilled in his mind.*

....

Here, the principal overt acts constituting the offense were the asportation and butchering of the animal—acts admittedly committed by Harrington and Pings without the assistance of Neely, except as a picket or watcher.... The law applicable to the facts is that, "when officers of the law are informed that a person intends to commit a crime against the property or person of another, the law permits them to afford opportunities for its commission and to lay traps which may result in the detection of the offender. To this end a person may be engaged to act with the one who is suspected and to be present with him at the time the crime is to be committed; and if the accused, having himself originally conceived the criminal intent, commits such of the overt acts as are necessary to complete the offense, he will not be protected from punishment by reason of the fact that when the acts were done by him the person who was present with the knowledge and approval of the authorities aided and encouraged their perpetration. *It is, of course, necessary that the defendant should have directly participated in so much of the entire transaction that the acts which he himself personally committed shall alone be sufficient to make out a complete offense against the law; for no act done by his feigned accomplice may be imputed to him, and if, in order to constitute the offense, it is necessary that something done by the supposed confederate shall be imputed to the accused, then the prosecution will fail."*

*Id.* 300 P. at 565–66 (quoting *People v. Lanzit,* 70 Cal.App. 498, 233 P. 816 (1924)) (emphasis added) (citations omitted).

The principle enunciated in *Neely,* which has been repeated by numerous courts under a variety of factual circumstances, *see, e.g., People v. Goldberg,* 152 Cal.App.2d 562, 314 P.2d 151, 157–58 (1957); *State v. Decker,* 321 Mo. 1163, 14 S.W.2d 617, 620 (1929); *State v. O'Donnell,* 138 Mont. 123, 354 P.2d 1105, 1107 (1960); *Shouquette v. State,* 25 Okl.Cr. 169, 219 P. 727, 731 (1923); *State v. Pacheco,* 13 Utah 2d 148, 369 P.2d 494, 495 (1962), is based in sound reason. It is the general rule that one who aids and abets another in criminal activity is liable for all of the "natural and probable consequences" of his accomplice's criminal acts, *see United States v. Barnett,* 667 F.2d 835, 841 (9th Cir.1982); *People v. Durham,* 70 Cal.2d 171, 74 Cal.Rptr. 262, 265, 449 P.2d 198, 201 (1969). Thus, the potential for abuse inherent in law enforcement methods such as those employed in the case at bar is substantial. Once an agent has succeeded in persuading an individual to take some substantial act in furtherance

---

5. Notably, this was not a case in which the court found that the owner's consent to Harrington's taking vitiated the unlawfulness of his acts. Like the majority today, the court in *Neely* concluded that Harrington had exceeded his rightful authority in taking and butchering the cattle. *Id.* 300 P. at 565. Nonetheless, the court concluded that Harrington's acts, as a feigned accomplice, could not be imputed to Neely. *Id.* 300 P. at 566.

of his general criminal scheme, the ultimate liability of the targeted defendant, if any, will depend upon which foreseeable crimes the agent *chooses* to commit in order to secure convictions against his criminal "accomplice."

In this case, Officer Snell shot four foxes. Vaden, as pilot of the plane from which they were shot, was charged with four separate criminal counts of taking foxes from the air out of season.[6] Had Snell opted to shoot a fifth fox, one more count could have been added to Vaden's indictment. In my view, it is clearly inconsistent with due process principles, and manifestly unjust, that the ultimate criminal liability of a defendant should be made to depend upon the good aim and/or the good intentions of the police officer charged with securing his arrest.

I would uphold those of Saltz' convictions which were based upon his independent criminal acts. However, I would reverse those convictions, for both Saltz and Vaden, which could not have been established but for the illegal acts of the government agents in this case, *i.e.*, the accomplice liability and transportation of illegally taken game charges. In my view, these convictions fall squarely within the parameters of the due process/outrageous conduct defense as discussed and applied in *Hohensee* and *Stenberg*.

Alternatively, even if the police conduct could not be deemed sufficiently "outrageous" to satisfy the requirements of the due process defense, I would hold that the convictions for accomplice liability must fail under the common law rule prohibiting imputation of the acts of a feigned accomplice to a targeted criminal defendant.

---

**6.** "Aiding and abetting" is, of course, not a separate offense. It is well established that aiding and abetting "does not constitute a discrete criminal offense but only serves as a more particularized way of identifying the 'persons involved' in the commission of the substantive offense." *United States v. Oates,* 560 F.2d 45, 54 (2d Cir.1977); *see also United States v. Campbell,* 426 F.2d 547, 553 (2d Cir.1970). Under AS 11.16.110 a criminal defendant is held "legally accountable for the conduct of another." Thus, it is the illegal takings by the undercover officers which are directly imputed to the defendants here.